# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

U.S. CAPITAL FUNDING VI, LTD,
an exempted company with
limited liability established
under the laws of the Cayman
Islands,

      Plaintiff,

v.

PATTERSON BANKSHARES, INC., a
Georgia corporation, FIRST
SOUTHERN BANK, formerly known
as Patterson Bank, a Georgia
corporation, J.P. BARNARD,
J.R., WILLIAM HUGHES, RONALD
THOMAS, COMMUNITY CAPITAL
ADVISORS, INC., a Georgia
corporation, and JOHN DOES 1-
50, Georgia citizens,

      Defendants.

CV 514-93

## ORDER

In this action, Plaintiff U.S. Capital Funding VI, Ltd. ("Plaintiff"), the beneficiary of certain trust preferred securities ("TruPS"), brings claims against the issuer of those securities, Patterson Bankshares, Inc. ("PBI"), and several related parties. Specifically, Plaintiff names the following as Defendants in this case: PBI; First Southern Bank (the "Bank"); J.P. Barnard, Jr., William Hughes, and Ronald Thomas ("Barnard,"

Hughes," and "Thomas," or, collectively, the "Director Defendants"); Community Capital Advisors, Inc. ("Community Capital"); and John Does 1-50. Plaintiff seeks relief from these Defendants on a number of theories, including fraudulent transfer, tortious interference with contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, breach of contract, and conspiracy to effect a fraudulent transfer.

Presently before the Court are several Motions to Dismiss separately filed by all of the Defendants, other than the unidentified John Does 1-50, collectively requesting a dismissal of Plaintiff's claims on jurisdictional grounds as well as for failure to state a claim upon which relief may be granted. Dkt. Nos. 16, 20-21, 24, 50-52, 56. Also before the Court is Plaintiff's Request for Oral Argument on the Defendants' Motions. Dkt. No. 36.

As discussed more fully below, the Defendants' Motions to Dismiss premised upon a lack of subject-matter jurisdiction (dkt. nos. 20, 24, 52, 56) are **GRANTED in part** and **DENIED in part** as follows: the Motions are **GRANTED** in that Plaintiff's claims for equitable relief against all Defendants are hereby **DISMISSED** for lack of subject-matter jurisdiction; the Motions are **DENIED** in that the Court retains jurisdiction over Plaintiff's claims for damages against all Defendants; and to

the extent that some of these Motions also seek dismissal on the basis of failure to state a claim (dkt. nos. 24, 52, 56), these portions of the Motions also are **DENIED.**

The Bank's Motion to Dismiss for failure to state a claim (dkt. no. 21) is **GRANTED in part** and **DENIED in part.** This Motion is **GRANTED** with respect to Plaintiff's claim of aiding and abetting breach of fiduciary duty against the Bank, and this claim is hereby **DISMISSED.** However, the Motion is **DENIED** as it relates to Plaintiff's fraudulent transfer claim against the Bank.

The remaining Motions to Dismiss on the basis of failure to state a claim (dkt. nos. 16, 50-51) are **DENIED.** Plaintiff's Request for Oral Argument (dkt. no. 36) is also **DENIED** at this time.

## FACTUAL BACKGROUND

Plaintiff is a limited liability company organized under the laws of the Cayman Islands, with its principal place of business located in the Cayman Islands, and is a citizen of the United Kingdom. Dkt. No. 49, ¶ 12. When the events giving rise to this action occurred, PBI operated as a bank holding company incorporated in Georgia with its principal place of business in Georgia, though PBI underwent administrative dissolution prior to the filing of this action. Id. at ¶¶ 9, 14. PBI's primary asset was its ownership interest in its subsidiary, the Bank,

AO 72A
(Rev. 8/82)

which is incorporated in Georgia and continues to maintain its principal place of business in Georgia. Id. at ¶¶ 1, 3, 15.

Barnard, Hughes, and Thomas, who reside in Georgia, comprised the board of directors of both PBI and the Bank at all relevant times. Id. at ¶¶ 5, 16, 18, 20. When the events giving rise to this action occurred, Hughes also held the position of Chief Executive Officer of the Bank, and Thomas, a practicing attorney, served as legal counsel to PBI and the Bank. Id. at ¶¶ 18, 20-21. Community Capital is a consulting firm that provides financial services to community banks and is incorporated in Georgia with its principal place of business in Georgia. Id. at ¶ 22. John Does 1-50 are the individuals who have purchased stock in the Bank and whose identities and places of residence are not yet known to Plaintiff. Id. at ¶ 23.

## I.    TruPS Issuance

In 1996, the Federal Reserve Bank authorized bank holding companies to use trust preferred securities ("TruPS") to raise their tier-1 capital to the level required by banking regulators for the bank holding companies to operate their banking businesses. Id. at ¶¶ 1, 27.[1] TruPS qualify as debt for tax

---

[1] "Tier-1 capital . . . . is the core measure of a bank's financial strength by regulatory standards." Dkt. No. 35, p. 3 n.3 (quoting Frontier State Bank Okla. City v. FDIC, 702 F.3d 588, 593 n.5 (10th Cir. 2012)). Specifically, tier-1 capital is comprised of "core capital, which consists primari[l]y of common stockholders' equity capital, noncumulative perpetual preferred stock and minority interests in the equity capital accounts of consolidated

purposes, so a bank holding company may deduct interest payments on TruPS while also using the capital raised through the issuance of TruPS to satisfy the tier-1 capital requirements. Id. at ¶ 28. In addition, the proceeds of a TruPS issuance may go back into the bank as equity, further adding to the bank's tier-1 capital. Id. at ¶ 29. Issuers of TruPS can defer quarterly interest payments for up to twenty consecutive quarters, but all deferred payments must be paid at the end of the deferral period, with accrued interest. Id. at ¶ 30. Thus, according to Plaintiff, TruPS are a "low-cost alternative to issuing common stock as a way to raise and maintain capital for holding companies and banks." Id. at ¶ 29.

In 2007, PBI issued TruPS securities through the Patterson Bankshares Capital Trust I (the "Trust"), a statutory business trust created pursuant to title 32, chapter 38 of the Delaware Code. Id. at ¶ 31. The Trust was established through a Declaration of Trust dated June 25, 2007, but is currently governed by an Amended and Restated Declaration of Trust dated June 27, 2007 (the "Declaration of Trust"). Id. at ¶ 32; see also Dkt. No. 49-2. PBI owns 100% of the residual common equity of the Trust, and Wilmington Trust Company serves as trustee (the "Trustee"). Dkt. No. 49, ¶¶ 33-34.

---

subsidiaries." Id. (alteration in original) (quoting Frontier State Bank Okla. City, 702 F.3d at 593 n.5).

AO 72A
(Rev. 8/82)

To acquire tier-1 capital, PBI caused the Trust to sell 3,000 TruPS with a liquidation amount of $1,000 per capital security; a fixed distribution rate per annum of 7.006% to be paid quarterly; and a variable distribution rate per annum, reset quarterly, equal to the London InterBank Offered Rater (LIBOR) plus 1.49% for each interest period after September 2012. Id. at ¶ 35. The TruPS mature in 2037. Id.

Plaintiff purchased, and thus became the beneficial owner of, 100% of the TruPS issued by PBI through the Trust. Id. at ¶ 36. As beneficial owner, Plaintiff is entitled to all funds paid pursuant to the TruPS, and, according to Plaintiff, it is the only party with an economic interest in the TruPS. Id. Upon Plaintiff's purchase of the TruPS, the Trust delivered the funds obtained from Plaintiff to PBI by purchasing a corresponding amount of debt securities (the "Debt Securities") issued by PBI. Id. at ¶ 37. PBI's payment obligations to the Trust under the Debt Securities mirror the Trust's payment obligations to Plaintiff under the TruPS. Id. As the Debt Securities are the only assets of the Trust, PBI's payments on the Debt Securities held by the Trust are the Trust's only source of income from which to make payments on the principal and interest owed to Plaintiff. Id. at ¶ 38. When PBI makes a payment of principal and interest on the Debt Securities to the

Trust, the Trust then uses those funds to make a payment to Plaintiff. Id. at ¶ 45.

According to Plaintiff, because the TruPS represent the undivided beneficial ownership interest in the assets of the Trust, and the Trust's only assets are the Debt Securities purchased from PBI, the TruPS reflect an ownership interest in the Debt Securities, which are maintained by the Trust for the benefit of Plaintiff. Id. at ¶ 39. Plaintiff alleges that its investment in the TruPS was intentionally structured by PBI to depend on PBI's financial ability, supported by its ownership of a regulated banking business, to satisfy the payment obligations. Id. at ¶ 46. Plaintiff maintains that it relied on this structure in deciding to invest in the TruPS, which was marketed to, and perceived by, Plaintiff as a "low-risk, low-return, fixed income investment[ ]." Id. at ¶ 47.

The Debt Securities that the Trust purchased from PBI are governed by an Indenture dated June 27, 2007 (the "Indenture"). Id. at ¶ 40. The Trustee of the Trust is also the trustee of the Indenture. Id. at ¶ 41. The Indenture details PBI's obligations as the issuer of the Debt Securities, id. at ¶ 42, and discusses the immunity of PBI's directors and officers as follows:

ARTICLE XIII
Immunity of Incorporators, Stockholders, Officers and
Directors

AO 72A
(Rev. 8/82)

Section 13.01. <u>Indenture and Debt Securities Solely</u>
<u>Corporate Obligation</u>.

> No recourse for the payment of the principal of
> or premium, if any, or interest on any Debt Security,
> or for any claim based thereon or otherwise in respect
> thereof, and no recourse under or upon any obligation,
> covenant or agreement of the Company in this Indenture
> or in any supplemental indenture, or in any such Debt
> Security, or because of the creation of any
> indebtedness represented thereby, shall be had against
> any incorporator, stockholder, officer, director,
> employee or agent, as such past, present or future, of
> the Company or of any predecessor or successor
> corporation of the Company, either directly or through
> the Company or any successor corporation of the
> Company, whether by virtue of any constitution,
> statute or rule of law, or by the enforcement of any
> assessment or penalty or otherwise; it being expressly
> understood that all such liability is hereby expressly
> waived and released as a condition of, and as a
> consideration for, the execution of this Indenture and
> the issue of the Debt Securities.

Dkt. No. 50-2, pp. 56-57. According to Plaintiff, because the
payments made under the Debt Securities are the only source of
payment made under the TruPS, Plaintiff, as beneficial owner of
100% of the TruPS, was intended to be a third-party beneficiary
of the Indenture. Dkt. No. 49, ¶ 43.

According to Plaintiff, the various agreements executed in
connection with the issuance of the Trust securities—the
Declaration of Trust, the Indenture, and a Guarantee Agreement
in which PBI directly guaranteed payment to the holders of the
TruPS—were part of a single, integrated transaction. <u>Id.</u> at ¶
48. Plaintiff further alleges that the parties intended and

understood that the rights and protections included in the agreements were for the benefit of the investors in the TruPS, to secure PBI's ultimate repayment of the TruPS. Id. Plaintiff relied on the rights and protections in these agreements when deciding to invest in the TruPS. Id. at ¶ 49.

## II.  Restrictions on the Disposition of PBI's Assets

From the outset, the parties intended for Plaintiff to look to PBI to satisfy any and all obligations owed to Plaintiff under the TruPS, an understanding reflected in the Guarantee Agreement. Id. at ¶ 50. Plaintiff represents that "[i]t was furthermore understood that PBI, as a bank holding company, would always have available to it at least substantially all of the assets of its wholly-owned subsidiary, the Bank, to satisfy and secure repayment obligations to [Plaintiff]." Id. at ¶ 51. According to Plaintiff, in order to protect its access to these assets, "it was imperative that the Indenture expressly require PBI to agree that it would not take any action to divorce the payment obligations on the TruPS from the primary assets that were intended to secure those payments, i.e., the sole ownership of the Bank's operating business assets." Id. at ¶ 52 (emphasis omitted).

Several provisions of the Indenture are relevant to this case:

- Section 3.07 expressly mandates that "if PBI ever were to transfer all or substantially all of its assets, the obligations securing repayment of the TruPS would become obligations of the entity acquiring the assets." Id. at ¶ 53.

- Section 5.01(d) provides that PBI's failure to comply with its covenant not to transfer all or substantially all of its assets without simultaneously conveying its repayment obligations on the TruPS would constitute an Event of Default. Id. at ¶ 54.

- Section 5.01(e) states that if PBI were ordered to wind up or liquidate its affairs, and that order were to remain unstayed and in effect for a period of ninety consecutive days, an Event of Default would occur. Id. at ¶ 55. Under such circumstances, the principal and any premium and accrued interest would become immediately due and payable. Id.

- Section 5.01(f) stipulates that an Event of Default would occur, making the principal and any premium and accured interest immediately due and payable, if PBI were to (a) initiate a voluntary bankruptcy or other similar proceeding, (b) consent to an order for relief in an involuntary bankruptcy or other similar proceeding, (c) agree to the appointment of a receiver or other similar

AO 72A
(Rev. 8/82)

official over it or a substantial portion of its property,
(d) make any general assignment for the benefit of
creditors, or (e) generally fail to pay its debts as they
come due. Id. at ¶ 56.

## III. Financial Decline of PBI and the Bank

In March of 2009, the Federal Deposit Insurance Corporation
(the "FDIC") "conducted a visitation of the Bank" and identified
"the emergence of certain unsatisfactory conditions." Dkt. No.
20-1, p. 3. The FDIC then "conducted a joint safety and
soundness examination," id., and determined that the Bank was
operating in an unsafe or unsound manner, dkt. no. 49, ¶ 57. As
a result, on January 29, 2010, the Bank agreed to the issuance
of a Consent Order (the "Consent Order") by the FDIC and the
Georgia Department of Banking and Finance (the "Georgia DBF")
requiring that the Bank take certain actions to eliminate and
correct the allegedly unsafe or unsound conditions. See Dkt.
No. 20-1, pp. 9-29 (citing 12 U.S.C. § 1818(b) and O.C.G.A. § 7-
1-91); Dkt. No. 49, ¶¶ 57-60.

The Consent Order called for additional oversight by the
Bank's board of directors, the retention of qualified
management, and the development of a performance-based
compensation plan, among other things. See Dkt. No. 20-1, pp.
11-15; Dkt. No. 49, ¶ 58. The Consent Order also directed the
Bank to develop a plan to reduce its concentrations of credit,

and prohibited the Bank from extending any further credit, to improve its risk profile. See Dkt. No. 20-1, pp. 15, 23-24; see also Dkt. No. 49, ¶ 59. Further, the Consent Order prohibited the Bank from declaring or paying out dividends, or making principal or interest payments on any debentures, without first obtaining the approval of regulatory officials. Dkt. No. 20-1, p. 18; Dkt. No. 49, ¶ 60.

Significantly, the Consent Order required the Bank to raise its tier-1 capital to an amount at or above 8% of its total assets and provided the following instruction:

> Any increase in Tier 1 Capital necessary to meet the[se] requirements . . . may be accomplished by the following:
> (i)     sale of common stock; or
> (ii)    sale of noncumulative perpetual preferred stock; or
> (iii)   direct contribution of cash by the Board, shareholders, and/or parent holding company; or
> (iv)    any other means that has been approved as acceptable to the Supervisory Authorities; or
> (v)     any combination of the above means.

Dkt. No. 20-1, pp. 15-18; see also Dkt. No. 49, ¶ 59. The Consent Order stated that if the Bank intended to sell new securities as its means of raising capital, it would first need to submit a plan detailing the proposed stock offering to the FDIC and obtain its approval prior to implementation. Dkt. No. 20-1, p. 17.

According to Plaintiff, because the Bank is PBI's primary asset, PBI also faced financial and regulatory pressure during

this time. Dkt. No. 49, ¶ 61. On June 1, 2010, PBI entered into an agreement ("Consent Agreement") with the Federal Reserve Bank of Atlanta and the Georgia DBF, which established certain obligations for PBI and limitations on its activities. Dkt. No. 20-1, pp. 32-37; Dkt. No. 49, ¶ 62. Specifically, the Consent Agreement required that PBI's directors "take appropriate steps to fully utilize [PBI's] financial and managerial resources . . . to serve as a source of strength to the Bank, including, but not limited to, taking steps to ensure that the Bank complie[d] with the Consent Order." Dkt. No. 20-1, p. 33; Dkt. No. 49, ¶ 63. Additionally, the Consent Agreement forbade PBI from making any payments of principal or interest on the Debt Securities or the TruPS without prior regulatory approval. Dkt. No. 20-1, pp. 33-34; Dkt. No. 49, ¶ 64. According to Plaintiff, PBI had already deferred on its March 2010 quarterly interest payment on the TruPS and has continued to defer on every quarterly interest payment since then. Dkt. No. 49, ¶ 65.

Plaintiff maintains that Hughes, Thomas, and Barnard, as directors of both the Bank and PBI, led the Bank and PBI into this unsafe and unsound condition. Id. at ¶ 66. According to Plaintiff, new and competent leadership would have benefitted the Bank and PBI by adding credibility to their efforts to raise capital, which would have improved their financial positions. Id. at ¶ 67. Plaintiff hypothesizes that if PBI had raised

additional capital or sold the Bank to a financially sound peer who could simultaneously assume the repayment obligations on the TruPS, it would have been at the risk of Hughes and Barnard losing their jobs with the Bank and the Director Defendants and other stockholders of PBI receiving little in return, given the Bank's poor financial condition and the requirement to assume the TruPS.  Id. at ¶ 68.  Instead, Plaintiff avers that in the three years following the entry of the Consent Order, Hughes, Thomas, and Barnard, "determined to maintain their own positions, prevented the Bank and PBI from taking either of these appropriate actions."  Id. at ¶ 69.

Under the continued direction of the Director Defendants, the financial condition of PBI and the Bank declined even further.  Id. at ¶ 70.  By late 2012, the Bank's tier-1 leverage ratio plummeted to 2.55%.  Id. at ¶ 71.  PBI's income statement for 2012 reflected a net loss of $887,000.  Id. at ¶ 73.  PBI's balance sheet showed $6,865,000 of liabilities (including the debt owing on the TruPS) and only $3,042,000 of assets (of which $2,844,000 was attributable to its 100% investment in the Bank), leaving the stockholders' equity at a negative $3,823,000.  Id.

## IV.  **PBI's Scheme to Transfer Its Assets**

According to Plaintiff, at this juncture, "PBI's financial situation called for it to declare bankruptcy."  Id. at ¶ 74. Plaintiff posits that if this had occurred, Plaintiff "likely

AO 72A
(Rev. 8/82)

would have ultimately ended up holding PBI's primary asset—its interest in the Bank." Id. Plaintiff speculates that in that scenario, it would have been in a position to protect what remained of its interest and to recover some of its losses through a judicially supervised bank sale. Id. A declaration of bankruptcy by PBI, however, would have left the Director Defendants and its other stockholders empty handed and resulted in a change in Bank ownership, with the new owner having the right to hire new management. Id. at ¶¶ 75-76. Thus, Plaintiff alleges that the Director Defendants were motivated to avoid declaring bankruptcy to preserve their equity investments and to maintain their positions of control. Id. at ¶ 77.

Plaintiff further hypothesizes that if PBI had declared bankruptcy or the Bank had failed, the Director Defendants would have suffered a loss of prestige and damage to their reputations in the community. Id. at ¶ 80. Plaintiff explains that the Director Defendants are prominent business figures in the small communities where the Bank operates its branches. Id. Additionally, Plaintiff maintains that if the Bank had failed, the Director Defendants would have faced the prospect of professional liability suits from the FDIC, which would have been particularly damaging to Thomas as an attorney. Id. at ¶¶ 78-79.

According to Plaintiff, to avoid these risks, the Director Defendants "devised a scheme to allow PBI's stockholders to position themselves ahead of [Plaintiff], and to protect [their] positions with PBI and the Bank and [their] reputation[s] within the community." Id. at ¶ 81. The Bank hired Community Capital, "a consulting firm that specializes in assisting community banks [with] rais[ing] capital." Id. at ¶ 82. Plaintiff maintains that the Director Defendants, "acting as directors of both PBI and the Bank and with the assistance of Community Capital, had the Bank issue new stock in a private placement to transfer what was effectively more than a 99% interest in PBI's assets." Id. at ¶ 83. Plaintiff alleges, on information and belief, that "new shares were issued in March 2013 to current holders of PBI's stock and their friends and famil[ies]." Id. at ¶ 84.

Plaintiff asserts that PBI never informed the Trustee or Plaintiff of its plan to have the Bank issue stock and avoided publicizing this information until the completion of the stock sale. Id. at ¶ 85. According to Plaintiff, these omissions were made out of concern "that the scheme would be discovered prior to its consummation" and in an attempt "to prevent Plaintiff from seeking injunctive relief." Id.

As a result of the stock sale, "PBI's interest in the Bank went from 100% to less than 1%, or from a book value of $2,844,000 to just $68,000." Id. at ¶ 86. Notably, PBI "did

AO 72A
(Rev. 8/82)

not receive any payment or other value for the loss of its majority position in the Bank." Id. at ¶ 87. Furthermore, the terms of the stock sale "did not require the new investors in the Bank to assume the repayment obligations to [Plaintiff]." Id. at ¶ 89. In effect, PBI's stockholders were able to preserve their ownership interests in the Bank—which were previously achieved indirectly through holding shares of PBI's stock but were encumbered by the debt to Plaintiff—by making "a new equity investment directly in the Bank that was free of that debt." Id. at ¶ 90.

PBI, in turn, "was left as a shell holding company with no real assets and no way to repay its liabilities to [Plaintiff]." Id. at ¶ 92. Plaintiff received nothing in the transaction and claims that its interests were harmed as a result thereof. Id. at ¶ 88. In particular, Plaintiff claims that "[a]t the time PBI caused the Bank's stock sale, nearly $3.7 million had accrued and was owing with respect to past due interest payments." Id. at ¶¶ 112-13.

Plaintiff alleges that "PBI and the Bank conspired to conduct the transfer of PBI's interest in the Bank at a time when PBI was insolvent." Id. at ¶ 91. According to Plaintiff, PBI deliberately constructed the stock issuance to shirk its obligations to the Trust and Plaintiff, "which reportedly had been a deterrent to PBI raising capital" and "were senior to

PBI's equity holders' rights." Id. at ¶ 94. Furthermore, Plaintiff contends that the Director Defendants and the Bank attempted to separate the Bank and its income-producing assets from PBI's repayment obligations on the TruPS. Id. at ¶¶ 91, 95. As a result, Plaintiff maintains that it "was denied its right to ensure that PBI would retain its primary asset—100% ownership in the Bank—to which [Plaintiff] could look for repayment" of the TruPS. Id. at ¶ 93. Plaintiff submits that this was the exact situation contemplated by the provision in the Indenture prohibiting PBI from transferring all or substantially all of its assets without ensuring that the transferee assume the obligations to Plaintiff. Id. at ¶ 95.

## V. Trustee's Approval of Filing Suit

Pursuant to the procedure set forth in Section 5(b) of Annex I of the Declaration of Trust, Plaintiff gave the Trustee notice of these allegedly wrongful actions and directed the Trustee to take action to remedy those wrongs in a letter dated November 26, 2013 (the "Direction Letter"). Id. at ¶ 101; see also Dkt. No. 49-1.[2] The Direction Letter details the facts and circumstances of each of the alleged wrongs and further states:

[2]  Section 5(b) of Annex I of the Declaration of Trust provides, in pertinent part, that

> [T]he Holders of a Majority in liquidation amount of Capital Securities, voting separately as a class, have the right to direct the time, method, and place of conducting any proceedings for any remedy available to the

AO 72A
(Rev. 8/82)

This letter constitutes [Plaintiff's] direction, as the holder of 100% of the outstanding TruPS, that [the Trustee] take steps to cause litigation to be instituted and pursued against [the Defendants], asserting claims of tortious interference, fraudulent transfer, breach of fiduciary duty, and aiding and abetting breach of fiduciary duty, as outlined above, and to amend its complaint to assert the additional claim of breach of contract against PBI should PBI not remedy the breach within 90 days of receiving a Notice of Default pursuant to Section 5.01(d) of the Indenture (the actions described in this paragraph and any actions ancillary thereto being referred to hereinafter collectively as the "Directed Actions").

Dkt. No. 49-1, p. 6.

The Trustee responded by letter on April 3, 2014, that it agreed, "under the particular facts of this case, including that [Plaintiff] appear[ed] to hold 100% of the Capital Securities, to defer to [Plaintiff] with respect to the Directed Actions," those being the actions "defined in the Direction Letter." Dkt. No. 49-3, p. 2. The Trustee thus consented to Plaintiff taking action to enforce the Trustee's rights as a creditor of PBI, which included the right to seek redress for a violation of its

Institutional Trustee, or exercising any trust or power conferred upon the Institutional Trustee under the Declaration, including the right to direct the Institutional Trustee, as holder of the Debentures, to (i) exercise the remedies available under the Indenture as the holder of the Debentures . . . If the Institutional Trustee fails to enforce its rights under the Debentures after the Holders of a Majority . . . have so directed the Institutional Trustee, to the fullest extent permitted by law, a Holder of Capital Securities may institute a legal proceeding directly against the Debenture Issuer to enforce the Institutional Trustee's rights under the Debentures without first instituting any legal proceeding against the Institutional Trustee or any other person or entity.

Dkt. No. 49, ¶ 102 (ellipses in original).

rights as well as the right to bring claims against the Director Defendants for breach of their fiduciary duties. Dkt. No. 49, ¶¶ 104-05.

## VI. PBI's Notice of Dissolution

On May 5, 2014, PBI issued notice that it was administratively dissolved by the Georgia Secretary of State and was winding up its affairs and liquidating its assets. Id. at ¶¶ 9, 96; see also Dkt. No. 24-1. According to Plaintiff, at the time of filing the Amended Complaint, PBI's remaining 1% interest in the Bank had a value of less than .7% of the total amount of its obligation to the Trust and Plaintiff. Dkt. No. 49, ¶¶ 9, 11, 98. Plaintiff alleges that, on information and belief, "by allowing PBI to begin the process of liquidation and winding up its affairs, the Director Defendants sought to finally extinguish PBI's obligations to repay what it received from [Plaintiff]." Id. at ¶ 99. Plaintiff asserts that "[a]t the same time, the [D]efendants improperly sought to preserve the Bank and its assets from the creditors of PBI." Id. at ¶ 100.

## VII. Plaintiff's Notice of Default

As required in the Indenture, Plaintiff sent PBI a Notice of Default prior to bringing suit for breach of the contractual provisions therein. Id. at ¶ 106. In the Notice of Default, Plaintiff informed PBI that two Events of Default had occurred

pursuant to Section 5.01 of the Indenture: (1) PBI had failed to comply with Section 3.07 by conspiring with the Bank and causing it to issue stock to investors, transferring 99% of PBI's ownership interest in the Bank to individuals who did not assume any repayment obligation regarding the TruPS, id. at ¶ 107; and (2) PBI had initiated administrative dissolution. Id. at ¶ 108.

PBI responded to the Notice of Default on December 29, 2014, denying that any Event of Default had taken place under either section of the Indenture. Id. at ¶ 109. Plaintiff alleges that PBI's response indicated that it has no intention to remedy the alleged defaults, and, as such, PBI is in breach of the Indenture. Id. at ¶ 110.

## VIII.    Plaintiff's Filing of Suit

On November 14, 2014, Plaintiff filed suit in this Court against PBI, the Bank, Community Capital, Hughes, Barnard, Thomas, and the John Doe shareholders of the Bank. Dkt. No. 1. Plaintiff cites diversity of citizenship as the basis for this Court's jurisdiction to hear Plaintiff's state-law claims, explaining that the parties are citizens of the State of Georgia and the United Kingdom, and that the amount in controversy exceeds $75,000. Dkt. No. 49, ¶ 24.

Plaintiff asserts its first cause of action, Count I, against PBI, the Bank, and John Does 1-50 for fraudulent transfer under O.C.G.A. §§ 18-2-70 et seq. Id. at ¶¶ 111-26.

AO 72A
(Rev. 8/82)

Pursuant to this Count, Plaintiff claims entitlement to an order voiding the sale of stock in the Bank. Id. at ¶ 125. Plaintiff further claims entitlement to equitable relief pursuant to O.C.G.A. § 18-2-77(a)(3)(C), including "an order compelling the Bank to assume PBI's obligations under the Indenture or otherwise take action to ensure that the TruPS will be repaid from the Bank's assets or, in the alternative, an equitable lien and constructive trust on the stock issued by the Bank." Id. at ¶ 126.

In Count II, Plaintiff brings a tortious interference claim against Community Capital and seeks damages in connection therewith. Id. at ¶¶ 127-37. In Count III, Plaintiff asserts a cause of action for breach of fiduciary duty against Barnard, Hughes, and Thomas, again seeking damages. Id. at ¶¶ 138-56. Additionally, Plaintiff sets forth a claim for damages in Count IV against the Bank and Community Capital for aiding and abetting the Director Defendants' alleged breach of their fiduciary duties. Id. at ¶¶ 157-69.

In addition to the foregoing counts, Plaintiff amended its original Complaint on April 2, 2015, to add Count V and Count VI. See generally id. Plaintiff's Count V is for breach of the Indenture against PBI and seeks damages. Id. at ¶¶ 170-82. Count VI asserts a cause of action against PBI and the Bank for conspiracy to effect a fraudulent transfer. Id. at ¶¶ 183-203.

AO 72A
(Rev. 8/82)

In connection with this Count, Plaintiff claims entitlement to the following: (1) an order voiding the sale of the Bank's stock; (2) equitable relief pursuant to O.C.G.A. § 18-2-77(a)(3)(C) and (b), including "an order compelling the Bank to assume PBI's obligations under the Indenture or otherwise take action to ensure that the TruPS will be repaid from the Bank's assets"; and (3) damages from PBI and the Bank. Id. at ¶¶ 201-03.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint contain both "a short and plain statement of the grounds for the court's jurisdiction" as well as "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(1)-(2). Accordingly, a responding party may move to dismiss the complaint based on a "lack of subject-matter jurisdiction" or a "failure to state a claim upon which relief can be granted," under Federal Rule of Civil Procedure 12(b)(1) and (6), respectively ("Rule 12(b)(1)" and "Rule 12(b)(6)"). In addition, Federal Rule of Civil Procedure 12(h)(3) ("Rule 12(h)(3)") provides that a district court must dismiss an action "[i]f the court determines at any time that it lacks subject-matter jurisdiction."

**I.   Rule 12(b)(1) Motion to Dismiss**

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) "can be asserted on either facial or factual grounds." Carmichael v. Kellogg, Brown & Root Servs., Inc., 572 F.3d 1271, 1279 (11th Cir. 2009). A "facial" challenge to subject-matter jurisdiction is based "solely on the allegations in the complaint. When considering such challenges, the court must, as with a Rule 12(b)(6) motion, take the complaint's allegations as true." Id.

By contrast, a "factual" challenge to jurisdiction relies on facts and circumstances existing outside of the complaint; in those circumstances, a court "may consider extrinsic evidence such as deposition testimony and affidavits." Id. In other words, "[b]ecause at issue in a factual [Rule] 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case," without attaching any presumptive truthfulness to the plaintiff's allegations. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990) (quoting Williamson v. Tucker, 645 F.2d 404, 412–13 (5th Cir. 1981)).

Here, Defendants attack subject-matter jurisdiction based not only on the factual allegations on the face of Plaintiff's Amended Complaint, but also on facts found in the Consent Order and Consent Agreement. See, e.g., Dkt. No. 20, p. 10. As these

AO 72A
(Rev. 8/82)

documents are neither included in nor attached to the Amended
Complaint, Defendants' challenge relies on facts existing
outside of the Amended Complaint and, therefore, is factual in
nature. Thus, in evaluating subject-matter jurisdiction in this
case, the Court must consider and weigh the extrinsic evidence
and need not accept Plaintiff's factual contentions as true.

## II. Rule 12(b)(6) Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) challenges the
legal sufficiency of the complaint in setting forth a claim to
relief. See Fed. R. Civ. P. 12(b)(6). While a complaint need
not contain detailed factual allegations, it "must contain
sufficient factual matter, accepted as true, to 'state a claim
to relief that is plausible on its face.'" Ashcroft v. Iqbal,
556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550
U.S. 544, 570 (2007)) (interpreting Fed. R. Civ. P. 8(a)(2)).
To be plausible on its face, a complaint must set forth enough
facts to "allow[] the court to draw the reasonable inference
that the defendant is liable for the misconduct alleged." Id.
At a minimum, a complaint should "contain either direct or
inferential allegations respecting all the material elements
necessary to sustain a recovery under some viable legal theory."
Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276,
1282-83 (11th Cir. 2007) (per curiam) (quoting Roe v. Aware

AO 72A
(Rev. 8/82)

Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

In evaluating a Rule 12(b)(6) motion, a court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Ordinarily, a court's review on a motion to dismiss is limited to the factual allegations on the face of the complaint. See Iqbal, 556 U.S. at 678. If a court is presented with matters outside the pleadings on a motion to dismiss, the motion to dismiss is converted into one for summary judgment. Fed. R. Civ. P. 12(d).

However, there are certain instances in which a court may consider matters outside the pleadings without transforming a motion to dismiss into a summary judgment motion. See Davis v. Self, 547 F. App'x 927, 929 (11th Cir. 2013). For example, a court may consider copies of documents that a plaintiff has attached to the complaint. See Brooks v. Blue Cross & Blue Shield of Fla., 116 F.3d 1364, 1368 (11th Cir. 1997) (a court may examine "the face of the complaint and attachments thereto"). In addition, a court may look to documents that are central to, or referenced in, the complaint. See Davis, 547 F. App'x at 929 (a court may reference "other sources courts ordinarily examine when ruling on . . . dismissal, in particular, documents incorporated into the complaint by

AO 72A
(Rev. 8/82)

reference" (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007))). Finally, a court may also consider facts that are subject to judicial notice. See Fed. R. Evid. 201(a)-(d); Tellabs, Inc., 551 U.S. at 322; see also Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Boateng v. InterAmerican Univ., Inc., 210 F.3d 56, 60 (1st Cir. 2000) (a court "may treat documents from prior state court adjudications as public records" subject to judicial notice).

## DISCUSSION

Defendants move to dismiss Plaintiff's Amended Complaint for lack of subject-matter jurisdiction and failure to state a claim pursuant to Rule 12(b)(1) and Rule 12(b)(6), respectively. See Dkt. Nos. 16, 20-21, 24, 50-52, 56.[3] Plaintiff has responded to Defendants' Motions, see dkt. nos. 35, 37, 53, 73, and has moved for a hearing on the same, dkt. nos. 36, 58. The Court,

---

[3] As John Does 1-50 have not been identified and, thus, have not received service of this action, there is no motion to dismiss pending as to them. However, given the Court's obligation under Rule 12(h)(3) to dismiss Plaintiff's claims at any time upon finding a lack of subject-matter jurisdiction, the Court will consider Plaintiff's claims against John Does 1-50 along with those against the moving Defendants in evaluating subject-matter jurisdiction in Part I of this Order. Even so, the Court does not have any similar obligation to dismiss sua sponte for failure to state a claim, and, therefore, Part II of this Order addresses the legal sufficiency of Plaintiff's claims for relief against only the moving Defendants, not Johns Does 1-50.

applying the above-described standards, addresses the issues raised in these submissions in turn.

## I.    Dismissal for Lack of Subject-Matter Jurisdiction

Defendants maintain that this Court lacks subject-matter jurisdiction to hear Plaintiff's claims, which they construe as attempting to collaterally attack and interfere with the Consent Order issued by the FDIC and Georgia DBF. See Dkt. No. 20; see also Dkt. Nos. 24, 39, 41, 52, 56. Defendants cite several grounds allegedly barring the Court from exercising jurisdiction over these claims: (1) that Congress granted the FDIC exclusive authority to establish capital requirements and to issue orders enforcing those requirements; (2) that Congress intended to preclude third-party lawsuits seeking to affect the enforcement of such an order; (3) that these congressional mandates preempt any state law permitting a court to review or affect, by injunction or otherwise, the enforcement of such an order; and (4) that Georgia law provides no basis to challenge or collaterally attack an order of the Georgia DBF. Dkt. No. 20, pp. 11-23. In addition, Defendants have submitted, as an attachment, an affidavit of Hughes as well as copies of the Consent Order and Consent Agreement. See Dkt. No. 20-1.

A federal district court has subject-matter jurisdiction over any civil action presenting a federal question. See 28 U.S.C. § 1331 ("The district courts shall have original

AO 72A
(Rev. 8/82)

jurisdiction of all civil actions arising under the
Constitution, laws, or treaties of the United States.").
Additionally, a district court's jurisdiction extends to any
civil action where there is diversity of citizenship among the
parties and the amount in controversy exceeds $75,000, excluding
interest and costs. See id. § 1332(a) ("The district courts
shall have original jurisdiction of all civil actions where the
matter in controversy exceeds the sum or value of $75,000,
exclusive of interest and costs, and is between (1) citizens of
different States; [or] (2) citizens of a State and citizens or
subjects of a foreign state . . . .").

Plaintiff's Amended Complaint cites diversity of
citizenship as the basis for this Court's subject-matter
jurisdiction, alleging that the parties are citizens of the
State of Georgia and the United Kingdom and that the amount in
controversy exceeds $75,000. Dkt. No. 49, ¶ 24 (citing 28
U.S.C. § 1332(a)). Indeed, it appears, and Defendants do not
dispute, that the conditions for diversity jurisdiction are
satisfied in this case. Thus, the Court must consider whether
any of the grounds advanced by Defendants nevertheless divests
this Court of jurisdiction over this matter.

**A. The FDIC's Exclusive Authority as a Jurisdictional Bar**

Defendants argue that Congress granted federal banking
agencies exclusive authority to establish capital requirements

AO 72A
(Rev. 8/82)

and to issue orders enforcing those requirements, thus precluding any review of the FDIC's decision regarding the Bank's capital requirements in this case. Dkt. No. 20, pp. 11-16 (citing 12 U.S.C. §§ 1818, 3907); see also Dkt. Nos. 24, 39, 41, 52, 56.

12 U.S.C. § 3907 ("Section 3907") states, in pertinent part, that "[e]ach appropriate [f]ederal banking agency shall have the authority to establish such minimum level of capital for a banking institution as the appropriate [f]ederal banking agency, in its discretion, deems to be necessary or appropriate in light of the particular circumstances of the banking institution." 12 U.S.C. § 3907(a)(2). If a banking institution fails to maintain capital at or above the minimum level determined by the federal banking agency, the agency, in its discretion, may deem such failure "to constitute an unsafe and unsound practice." Id. § 3907(b)(1). In such circumstances, the federal banking agency "may issue a directive . . . requir[ing] the banking institution to submit and adhere to a plan acceptable to the appropriate [f]ederal banking agency describing the means and timing by which the banking institution shall achieve its required capital." Id. § 3907(b)(2)(A)-(B)(i). This directive, including any plan submitted pursuant thereto, is enforceable pursuant to the provisions of 12 U.S.C. § 1818(i) ("Section 1818(i)"). Id. § 3907(b)(2)(B)(ii).

AO 72A
(Rev. 8/82)

In addition, if, "in the opinion of the appropriate [f]ederal banking agency," any banking institution is engaging in "an unsafe or unsound practice," the agency may issue and serve upon the banking institution a notice setting forth such charges and fixing a time for a hearing thereon. Id. § 1818(b)(1). Upon the consent of the banking institution, or upon a finding that the record of the hearing establishes an unsafe or unsound practice, the federal banking agency may issue and serve "an order to cease and desist from any such violation or practice" and "to take affirmative action to correct the conditions resulting from any such violation or practice." Id. As with directives issued pursuant to Section 3907, a cease-and-desist order is enforceable under Section 1818(i). See id. § 1818(i)(1).

Section 1818(i) provides as follows:

> The appropriate Federal banking agency may in its discretion apply to the United States district court, or the United States court of any territory, within the jurisdiction of which the home office of the depository institution is located, for the enforcement of any effective and outstanding notice or order issued under this section or under section 1831o or 1831p-1 of this title, and such courts shall have jurisdiction and power to order and require compliance herewith; but except as otherwise provided in this section or under section 1831o or 1831p-1 of this title no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order under any such section, or to review, modify, suspend, terminate, or set aside any such notice or order.

Id. § 1818(i)(1) (emphasis omitted).

In the case at bar, the FDIC's joint safety and soundness examination, conducted in 2009, suggested that the Bank was operating in an unsafe or unsound manner. Dkt. No. 20-1, p. 3; Dkt. No. 49, ¶ 57. Upon the Bank's consent, the FDIC, acting pursuant to its authority to issue a cease-and-desist order, entered the Consent Order on January 29, 2010. See Dkt. No. 20-1, pp. 9-29 (citing 12 U.S.C. § 1818(b) and O.C.G.A. § 7-1-91); Dkt. No. 49, ¶¶ 57-60. True to form, the Consent Order prohibited the Bank from engaging in the allegedly unsafe and unsound practices and required it to take affirmative action to correct the same, including taking steps to raise its tier-1 capital to an amount at or above 8% of its total assets. Dkt. No. 20-1, pp. 15-18; Dkt. No. 49, ¶ 59. The Consent Order also provided, "Any increase in Tier 1 capital . . . may be accomplished" by several methods, including "a sale of stock" or "any other means that has been approved as acceptable." Dkt. No. 20-1, p. 16.

Defendants are correct in arguing that pursuant to Section 1818(i), this Court is without jurisdiction to review or affect, by injunction or otherwise, the FDIC's capital directive as set forth in the Consent Order. Dkt. No. 20, pp. 13-16 (citing Frontier State Bank Okla. City, 702 F.3d at 596, and FDIC v. Bank of Coushatta, 930 F.2d 1122, 1129 (5th Cir. 1991), for the

AO 72A
(Rev. 8/82)

proposition that district courts lack jurisdiction to review the FDIC's decisions regarding capital requirements). In this case, however, Plaintiff does not challenge the soundness of the FDIC's decision to set the Bank's minimum capital amount at 8%, nor does Plaintiff attack the wisdom of the various methods suggested by the FDIC for meeting the capital requirement. Rather, Plaintiff alleges that PBI, the Bank, and the Director Defendants, when faced with several options for raising the Bank's capital, pursued a method causing them to breach their existing duties to Plaintiff and to engage in fraudulent and tortious activity. See Dkt. No. 49, ¶¶ 57-100.[4] Because it is this action for which Plaintiff seeks relief, an evaluation of Plaintiff's claims would not require passing upon the terms of, or affecting in any way, the capital directive set by the FDIC.

Thus, Plaintiff's claims do not concern the FDIC's exclusive authority to set minimum capital requirements and to issue orders regarding the same. As such, Section 1818(i) does not serve as a bar to this Court's jurisdiction on this basis.

[4] Plaintiff's briefing on this point is convincing. Plaintiff notes that the Consent Order "did not direct the sale of Bank stock and did not set the specific terms of any transaction by which the Bank should meet the Tier 1 capital level requirements." Dkt. No. 35, p. 9 (citing Dkt. No. 20, p. 6). Plaintiff further emphasizes that "[t]he Consent Order did not authorize the Defendants to raise capital at any expense, including by breaching existing contractual relationships and engaging in tortious or fraudulent conduct." Id. As such, Plaintiff contends that "Defendants had options as to the type of transaction and the terms" and, therefore, "could have and should have found a way to avoid breaching their obligations and duties to Plaintiff." Id. (citing Dkt. No. 1, ¶¶ 67, 73-75).

Defendants' Motions (dkt. nos. 20, 24, 52, 56) are **DENIED** to the extent that they rely on the FDIC's exclusive authority to set capital requirements as a jurisdictional bar.

### B. Preclusion of Third-Party Lawsuits as a Jurisdictional Bar

Defendants contend that Congress, in authorizing federal banking agencies to file suit in district court under Section 1818(i), intended to preclude third-party lawsuits, such as this one, seeking to affect the enforcement of the agency's orders. Dkt. No. 20, pp. 16-20; see also Dkt. Nos. 24, 39, 41, 52, 56.

Section 1818(i) provides that a federal banking agency may file suit in district court to enforce or require compliance with an outstanding order, but that no court has jurisdiction "to affect by injunction or otherwise" the enforcement of such order or "to review, modify, suspend, terminate, or set aside" such order. 12 U.S.C. § 1818(i)(1).

As cited by Defendants, several courts have found that Section 1818(i) precludes subject-matter jurisdiction where the plaintiff seeks relief for the defendant's improper practices that are the very conduct giving rise to, and resolved by, the federal banking agency's consent order. See, e.g., Anderson v. Deutsche Bank Nat'l Trust Co., No. 13-CV-12854, 2014 WL 988994, at *4 (E.D. Mich. Mar. 13, 2014) (reasoning that because the consent order addressed and sought to correct the defendant's

AO 72A
(Rev. 8/82)

improper practices, relief based on those practices would necessarily affect the enforcement of the consent order); Bakenie v. JPMorgan Chase Bank, N.A., No. SACV 12-60 JVS MLGX, 2012 WL 4125890, at *3 (C.D. Cal. Aug. 6, 2012) (same). In addition, at least one court has found that Section 1818(i) deprives courts of jurisdiction to hear claims for relief that, if granted, would require the defendant to act in direct contravention of the consent order. Am. Fair Credit Ass'n v. United Credit Nat'l Bank, 132 F. Supp. 2d 1304, 1312 (D. Colo. 2001) (no jurisdiction over claims seeking money damages where consent order expressly mandated that defendant cease all payments to plaintiff).

By contrast, these and other courts have determined that Section 1818(i) does not disrupt jurisdiction over claims seeking relief that is neither addressed in nor inconsistent with the consent order, but rather is separately provided at law. See, e.g., Ellis v. J.P. Morgan Chase & Co., 950 F. Supp. 2d 1062, 1078-79 (N.D. Cal. 2013) (jurisdiction to hear fraud claims premised on defendant's improper action where consent order was silent as to relief sought and defendant failed to show how relief would necessarily affect enforcement of order); Rex v. Chase Home Fin. LLC, 905 F. Supp. 2d 1111, 1129 (C.D. Cal. 2012) (jurisdiction to hear contract claims seeking relief not addressed in consent order); In re JPMorgan Chase Mortg.

AO 72A
(Rev. 8/82)

Modification Litig., 880 F. Supp. 2d 220, 232 (D. Mass. 2012) (same); Am. Fair Credit Ass'n, 132 F. Supp. 2d at 1312 (retaining jurisdiction over contract and tort claims seeking relief not covered in the consent order); cf. Anderson, 2014 WL 988994, at *5 ("This is not a situation where the plaintiff is bringing separate claims, such as breach of contract or promissory estoppel, related to a foreclosure; in this case, Plaintiffs premise their relief entirely on the Consent Orders.") Furthermore, at least one court has held that Section 1818(i) does not preclude subject-matter jurisdiction over claims against any defendants who are not parties to the consent order. Am. Fair Credit Ass'n, 132 F. Supp. 2d at 1311.[5]

Based on this guidance, it appears that Section 1818(i) precludes this Court from exercising jurisdiction over Plaintiff's claims seeking to undo the stock issuance or impose repayment obligations on the Bank. Indeed, the Consent Order addresses the Bank's stock issuance as an acceptable means of raising capital, and, presumably, the FDIC gave prior approval for the Bank to issue stock for that purpose. See Dkt. No. 20-1, pp. 16-17. At this point, an order directing the Bank to undo the stock issuance, and thus forfeit any capital raised

---

[5] While Defendants would have the Court believe that these cases are at odds, see dkt. no. 20, p. 18, the cases reflect similar reasoning and reach opposite outcomes based only upon the factual circumstances of each case. As such, the Court finds each of these cases to be instructive here.

thereby, would require the Bank to take action directly contrary to the FDIC's mandate to raise and maintain its tier-1 capital at or above the specified level.

Additionally, the Consent Order restricts the Bank from incurring liabilities, aims to improve the Bank's risk profile, and prohibits the Bank from making principal or interest payments on any debentures without prior approval. Id. at pp. 15, 18, 23-24. Moreover, the FDIC's approval of the Bank's proposed stock issuance likely did not contemplate that the issuance would come with these strings attached—namely, the obligation to repay the debt owing under the TruPS. For these reasons, requiring the Bank to assume repayment obligations amounting to over $3 million would serve to undermine the terms and the purpose of the FDIC's Consent Order. Under such circumstances, Section 1818(i) bars this Court from exercising jurisdiction.

Even so, the Court retains jurisdiction over Plaintiff's claims for money damages. While the Consent Order addresses the Bank's ability to make certain payments, it does not shield the Bank entirely from suits by nonparties asserting rights to relief at law. Indeed, the FDIC could not have intended to insulate the Bank from all lawsuits arising in contract and tort—even those wholly unrelated to the Bank's stock issuance—simply because those actions might result in a money judgment.

AO 72A
(Rev. 8/82)

Additionally, PBI, Community Capital, the Director Defendants, and John Does 1-50 are not parties to the Consent Order, and, therefore, Section 1818(i) has no effect on the damages claims as to them. Thus, any relief granted pursuant to Plaintiff's damages claims would not have any effect on the FDIC's enforcement of the Consent Order.

Accordingly, Defendants' Motions to Dismiss on this basis (dkt. nos. 20, 24, 52, 56) are **GRANTED in part** and **DENIED in part:** The Motions are **GRANTED** to the extent that the Court lacks subject-matter jurisdiction over, and hereby **DISMISSES,** Plaintiff's third-party claims seeking to undo the Bank's issuance of stock and to require the Bank to assume the repayment obligations on the TruPS. The Motions are **DENIED** in that the Court retains jurisdiction to hear Plaintiff's claims as they relate to money damages.

### C. Preemption of State-Law Claims as a Jurisdictional Bar

Defendants further assert that Sections 3907 and 1818(i) preempt any state-law claims that may otherwise appear to afford a basis for reviewing or affecting, by injunction or otherwise, the enforcement of a federal banking agency's order. Dkt. No. 20, pp. 20-21; see also Dkt. Nos. 24, 39, 41, 52, 56.

In determining whether a federal statute preempts state law, the ultimate touchstone is congressional intent. Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998) (citing

AO 72A
(Rev. 8/82)

Perry v. Mercedes Benz of N. Am., Inc., 957 F.2d 1257, 1261 (5th Cir. 1992)). Congress, in passing a federal law, may effectively preempt a state law in three different ways: "(1) express preemption; (2) field preemption (regulating the field so extensively that Congress clearly intends the subject area to be controlled only by federal law); and (3) implied (or conflict) preemption." Id. Defendants assert that Plaintiff's state-law claims concern the FDIC's regulation of the Bank's capital and, therefore, are preempted under the third type—implied, or conflict, preemption. Dkt. No. 20, p. 20.

Section 3907 grants a federal banking agency authority, "in its discretion" and as it "deems to be necessary or appropriate," to set a banking institution's minimum capital level. 12 U.S.C. § 3907(a)(2). Section 1818(i) provides a vehicle for enforcing a capital directive or a consent order related thereto, and limits a court's jurisdiction to review, or affect by injunction or otherwise, the FDIC's orders. Id. § 1818(i)(1).

In the previous Subpart, the Court addressed the extent to which Section 1818(i) precludes jurisdiction over Plaintiff's third-party claims seeking relief interfering with the FDIC's enforcement of the Consent Order in this case. Though cast in terms of preemption rather than subject-matter jurisdiction, Section 1818(i) applies equally here. For the reasons discussed

in that Subpart, Section 1818(i) impliedly preempts Plaintiff's state-law claims seeking to reverse the stock sale or to require the Bank to assume PBI's payment obligations on the TruPS, but it does not preempt Plaintiff's claims for damages. See Irving, 136 F.3d at 768 ("Conflict preemption exists where state law actually conflicts with federal law, making it impossible to comply with both, or where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.").

As such, preemption provides an additional or alternative basis for dismissal of Plaintiff's claims for equitable relief, and Defendants' Motions to Dismiss (dkt. nos. 20, 24, 52, 56) are **GRANTED** to this extent. However, because Plaintiff's damages claims are not preempted, Defendants' Motions to this end (dkt. nos. 20, 24, 52, 56) are **DENIED**.

### D. Georgia Law as Jurisdictional Bar

Finally, Defendants argue that Plaintiff has no basis under Georgia law to challenge or collaterally attack an order of the Georgia DBF. Dkt. No. 20, pp. 21-23; see also Dkt. Nos. 24, 39, 41, 52, 56.

Much like the authority vested in federal banking agencies by virtue of Section 3907, O.C.G.A. § 7-1-91 ("Section 7-1-91") authorizes the Georgia DBF to issue an order directing a financial institution to raise its capital "[w]henever it shall

AO 72A
(Rev. 8/82)

appear to the [Georgia DBF] that the capital stock of a financial institution has been reduced below the minimum required by law or below the amount required by its articles or that its net assets are less than the amount of its capital stock." O.C.G.A. § 7-1-91(a). In addition, Section 7-1-91 permits the Georgia DBF to issue a cease-and-desist order whenever it appears that any financial institution "is conducting business in an unsafe or unauthorized manner." Id. § 7-1-91(d).

Further, O.C.G.A. § 7-1-90(a) ("Section 7-1-90(a)") sets forth a specific procedure for obtaining judicial review of an order issued by the Georgia DBF. That section provides, in relevant part, that

> [a]ny final action of the [Georgia DBF] or refusal of the [Georgia DBF] to act may be subject to judicial review by any person or corporation affected by such action. Such action shall be brought within 60 days of the final action or refusal of action by the [Georgia DBF] as a special statutory proceeding in the county in which the affected person or corporation resides or is domiciled if within this state (which in the case of a corporation shall be the county of its registered office if it has such an office) or in Fulton County if the affected person or corporation resides or is domiciled outside of this state. The review shall be conducted by the court without a jury.

Id. § 7-1-90(a).

Defendants contend that Section 7-1-90(a) displaces any other avenues of judicial review of a Georgia DBF order under state law, and, therefore, Plaintiff's challenge to the Consent

AO 72A
(Rev. 8/82)

Order issued by the FDIC and the Georgia DBF should have been filed in the manner, and within the time frame, set forth under that statute. Dkt. No. 20, pp. 22-23. However, for the reasons discussed in Subpart I.A, Plaintiff's claims do not appear to request, or even indirectly involve, an evaluation of the terms of the Consent Order. Rather, Plaintiff's state-law claims primarily concern its rights separately arising by contract or by law as well as alleged violations of those rights through events occurring more than three years after the entry of the Consent Order. See Dkt. No. 49, ¶¶ 57, 84. Consequently, Plaintiff could not have brought these claims within sixty days of the entry of the Consent Order, and, in any event, these claims would not have been the proper subject of an action under Section 7-1-90(a).

Thus, Section 7-1-90(a) does not displace Plaintiff's state-law claims or otherwise constrain the Court's jurisdiction. Insofar as Defendants' Motions to Dismiss (dkt. nos. 20, 24, 52, 56) seek dismissal on this basis, those Motions are **DENIED**.

## II. Dismissal for Failure to State a Claim

Defendants also move to dismiss pursuant to Rule 12(b)(6), arguing that Plaintiff fails to state any claim for relief against them. See Dkt. Nos. 16, 21, 24, 50-52, 56. Taken together, Defendants have filed Motions challenging the legal

AO 72A
(Rev. 8/82)

sufficiency of Plaintiff's pleading of all counts other than Count V of the Amended Complaint.  See id.[6]

## A. Count I: Fraudulent Transfer

Count I of Plaintiff's Amended Complaint seeks relief from PBI, the Bank, and John Does 1-50 on the basis of an allegedly fraudulent transfer under Georgia's Uniform Fraudulent Transfer Act, O.C.G.A. §§ 18-2-70 to -81 (the "UFTA").  Dkt. No. 49, ¶¶ 111-26.[7]

The UFTA "allow[s] courts to set aside transfers made 'with actual intent to hinder, delay, or defraud' creditors" as well as "transfers indicative of fraud even though actual fraud may not be provable."  Kipperman v. Onex Corp., 411 B.R. 805, 828 (Bankr. N.D. Ga. 2009).  Under the UFTA, when a plaintiff alleges fraudulent transfer on the basis of actual fraud, the

---

[6] PBI has not moved to dismiss Plaintiff's claim of breach of the Indenture asserted against it in Count V.  Indeed, the record reflects that after Plaintiff amended its original Complaint to add claims for breach of the Indenture in Count V and conspiracy in Count VI, see dkt. no. 49, PBI filed a Motion to Dismiss the conspiracy claim pursuant to Rule 12(b)(6), see dkt. no. 51, but did not file a similar motion with respect to the breach of the Indenture claim in Count V.  As a result, the Court presumes that PBI does not intend to challenge the legal sufficiency of Count V at this time.

[7] O.C.G.A. § 18-2-70 has since been amended so as to rename this article from the "Uniform Fraudulent Transfers Act" to the "Uniform Voidable Transactions Act."  However, this, as well as other amendments to this article, do not apply here, because the transaction alleged to have been fraudulent as well as the filing of this action occurred before these amendments took effect on July 1, 2015.  See S.B. No. 65, 2015 Gen. Assemb., Reg. Sess. (Ga. 2015) (setting forth the effective date and applicability of the amendments to O.C.G.A. §§ 18-2-70 to -81).  Accordingly, the Court continues to use the "UFTA" designation and the prior versions of these statutes for the purposes of the present litigation.

plaintiff must demonstrate that the debtor (a) made a transfer or incurred an obligation and (b) did so "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor," as shown through direct evidence or various "badges of fraud." See O.C.G.A. § 18-2-74(a)(1); Kipperman, 411 B.R. at 829; see also O.C.G.A. § 18-2-74(b) (listing various factors that are considered indicia, or "badges," of fraud).

By contrast, a plaintiff claiming fraudulent transfer based on a theory of constructive fraud must demonstrate that the debtor (a) made a transfer or incurred an obligation, (b) received "less than reasonably equivalent value" in consideration, and (c) was insolvent at the time of the transfer or obligation or became insolvent as a result thereof. See O.C.G.A. §§ 18-2-74(a)(2), 18-2-75(a); Kipperman, 411 B.R. at 828.

However, given the dearth of Georgia case law construing the UFTA's provisions, "Georgia courts look to the decisions of other jurisdictions for guidance." Jones v. Tauber & Balser, P.C., 503 B.R. 162, 182 (Bankr. N.D. Ga. 2013) (alterations omitted) (quoting Truelove v. Buckley, 733 S.E.2d 499, 501 (Ga. Ct. App. 2012)).

## 1.    Debtor-Creditor Relationship

As an apparent prerequisite to any claim of fraudulent transfer, whether actual or constructive, the parties must share

an underlying relationship of debtor and creditor. See O.C.G.A. § 18-2-74(a); see also id. § 18-2-77 (contemplating that only a "creditor" can obtain relief against a fraudulent transfer). The UFTA defines "creditor" as "a person who has a claim," and "debtor" as "a person who is liable on a claim." Id. § 18-2-71(4), (6). A "claim," in turn, is defined as any "right to payment, whether or not the right is reduced to judgment, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Id. § 18-2-71(3); see also Kipperman, 411 B.R. at 832 ("Under Georgia law a creditor relationship arises when 'one person, by contract or by law, is liable and bound to pay to another an amount of money, certain or uncertain.'" (quoting Beeson v. Crouch, 490 S.E.2d 118 (Ga. Ct. App. 1997))).

Plaintiff makes a plausible showing that a debtor-creditor relationship existed between PBI and Plaintiff, a fact which PBI does not appear to contest. Indeed, in the Amended Complaint, Plaintiff alleges that PBI "took advantage of the TruPS financing structure by issuing TruPS securities through the . . . Trust" and that Plaintiff "is the beneficial owner of 100% of the TruPS and is entitled to all funds paid pursuant to the TruPS." Dkt. No. 49, ¶¶ 31, 36. Plaintiff also states that "various agreements [were] executed in connection with the TruPS issuance," including "the Declaration of Trust, the Indenture

AO 72A
(Rev. 8/82)

and a Guarantee Agreement," in which PBI "directly guaranteed payment under the TruPS." Id. at ¶ 48. Further, Plaintiff claims that the Trust securities "require quarterly interest payments" and that "[a]t the time PBI caused the Bank's stock sale, nearly $3.7 million had accrued and was owing with respect to past due interest payments." Id. at ¶¶ 112-13. These undisputed contentions sufficiently establish the existence of a debtor-creditor relationship between PBI and Plaintiff, by virtue of Plaintiff's contractual right to payment on the TruPS securities and PBI's liability therefor.

More contentious, though ultimately falling in Plaintiff's favor, is the existence of a debtor-creditor relationship with the Bank. Plaintiff alleges that, in purchasing the TruPS, "[i]t was furthermore understood that PBI, as a bank holding company, would always have available to it at least substantially all of the assets of its wholly-owned subsidiary, the Bank, to satisfy and secure repayment obligations to [Plaintiff]." Id. at ¶ 51. Plaintiff also contends that "[t]o protect the Plaintiff's access to these assets," the Indenture required that PBI "agree that it would not take any action to divorce the payment obligations on the TruPS from the primary assets that were intended to secure those payments, i.e., the sole ownership of the Bank's operating business assets." Id. at ¶ 52 (emphasis omitted). As such, Plaintiff asserts that the

stock issuance transferring the control of the Bank from PBI to other investors served to "leave [Plaintiff] without the ability to look to that asset as a source of funds for repayment." Id. at ¶ 120.

To the extent that Plaintiff alleges a common understanding that it could seek payment out of the Bank's assets directly, Plaintiff sufficiently demonstrates an equitable right to relief to support the finding of a debtor-creditor relationship with the Bank at this stage. Moreover, as discussed below, Plaintiff alleges facts tending to suggest that PBI and the Bank could be considered one in the same, in which case Plaintiff's debtor-creditor relationship with PBI would operate equally as against the Bank. Under these circumstances, the Court cannot find, at this time, that Plaintiff fails to make a plausible showing of a debtor-creditor relationship with the Bank.

Accordingly, Plaintiff's allegations with respect to its status as creditor are sufficient to sustain fraudulent transfer claims against both PBI and the Bank.

### 2. **Transfer of an Asset**

The first element of a prima facie case of fraudulent transfer, whether based on actual or constructive fraud, requires the debtor to have made a transfer or incurred an obligation. See O.C.G.A. § 18-2-74(a). Under the UFTA, "transfer" refers to "every mode, direct or indirect, absolute

or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease, and creation of a lien or other encumbrance." Id. § 18-2-71(12). The UFTA further defines "asset" as "property of a debtor," and "property" as "anything that may be the subject of ownership." Id. § 18-2-71(2), (10).[8]

Courts applying Georgia law have recognized that the UFTA's definitions of both "transfer" and "property" are broad. See Jones, 503 B.R. at 182 (property); Bishop v. Patton, 706 S.E.2d 634, 641 n.5 (Ga. 2011) (transfer). Indeed, other states applying the definition of "transfer" under their versions of the UFTA have determined that "[t]he form of the transaction by which property, liable to the satisfaction of creditors' claims, is fraudulently sought to be placed beyond their reach is immaterial." 37 C.J.S. Fraudulent Conveyances § 22 (2015) (citing Pennington v. Bigham, 512 So.2d 1344 (Ala. 1987)). In

---

[8] Specifically, "asset" is defined as "property of a debtor, but the term does not include" the following:

> (A) [p]roperty to the extent it is encumbered by a valid lien;
> (B) [p]roperty to the extent it is generally exempt under nonbankruptcy law; or
> (C) [a]n interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

O.C.G.A. § 18-2-71(2).

AO 72A
(Rev. 8/82)

other words, "[w]hatever may be the external form of the transaction, if its design is to defraud creditors, it is invalid." Id. (citing Birmingham Tr. & Sav. Co. v. Shelton, 163 So. 593 (Ala. 1935), and Leifer v. Murphy, 267 N.Y.S. 701 (N.Y. Sup. Ct. 1933)).

In addition, many states, including Georgia, have found that a "transfer" may occur even if the debtor was not a party to, or did not carry out, the transfer. See, e.g., Bishop, 706 S.E.2d at 643; 37 C.J.S. Fraudulent Conveyances, supra, § 22 (citing Sherry v. Ross, 846 F. Supp. 1424 (D. Haw. 1994)). For example, Georgia has held that "transfer" under the UFTA is "broad enough to encompass a co-owner's withdrawal of funds from a joint bank account" maintained with the debtor. See Bishop, 706 S.E.2d at 643 (explaining that the effect of a withdrawal of funds by the debtor's son was to take the funds out of the joint control with his father, the debtor, and to place them solely under his own control). Similarly, other states have recognized that a transfer carried out by an "alter ego" or a "mere instrumentality" of a judgment debtor is sufficient to constitute a transfer by the debtor itself. 37 C.J.S. Fraudulent Conveyances, supra, § 22 (citing Dwyer v. Meramec Venture Assocs., LLC, 75 S.W.3d 291 (Mo. Ct. App. 2002)).

While Georgia courts have not addressed an "alter ego" theory of liability in the specific context of the UFTA, Georgia

AO 72A
(Rev. 8/82)

law generally permits "piercing the corporate veil" to hold owners liable for the transactions of a corporation that functions as their alter ego, or a mere instrumentality, rather than a separate corporate entity. See Johnson v. Allied Recycling, Inc., 746 S.E.2d 728, 731 (Ga. Ct. App. 2013) ("To establish an alter ego cause of action in Georgia, . . . it must be shown that the shareholders of a corporation 'disregarded the corporate entity and made it a mere instrumentality for the transaction of their own affairs; that there is such unity of interest and ownership that the separate personalities of the corporation and the owners no longer exist.' . . . . This concept 'is applied in Georgia to remedy injustices which arise where a party has over extended his privilege in the use of a corporate entity in order to defeat justice, perpetuate fraud or to evade contractual or tort responsibility.'" (citations omitted) (quoting Baillie Lumber Co. v. Thompson, 612 S.E.2d 296 (Ga. 2005))).

Given Georgia's aim to broadly construe the term "transfer" under the UFTA, it appears, at least for purposes of this Motion, that a "transfer" occurred pursuant to Georgia law. Plaintiff claims that the Director Defendants, "acting as directors of both PBI and the Bank and with the assistance of Community Capital, had the Bank issue new stock in a private placement to transfer what was effectively more than a 99%

interest in PBI's assets." Dkt. No. 49, ¶ 83; see also id. at ¶ 119 ("PBI caused the Bank to issue stock to the [D]efendant John Does 1-50 investors to transfer PBI's control of the Bank."). Plaintiff states that following the stock sale, PBI's ownership interest in the Bank "went from 100% to less than 1%, or from a book value of $2,844,000 to just $68,000." Id. at ¶ 86.

Based on these facts, it is plausible that the stock issuance served as an indirect method of transferring PBI's ownership interest in the Bank to other stockholders. See O.C.G.A. § 18-2-71(12) (defining "transfer" as "every mode, direct or indirect . . . of disposing of or parting with an asset or an interest in an asset"). Notwithstanding the otherwise legal nature of a stock issuance, Plaintiff demonstrates that the transaction in this case nevertheless is the type contemplated under the UFTA, as it is plausible that it was designed to defraud PBI's creditors. Moreover, while it was the Bank, rather than PBI, who actually sold the stock, this fact is not fatal to Plaintiff's claims under Georgia law. Plaintiff's allegations plausibly suggest that PBI treated its wholly-owned subsidiary, the Bank, as its alter ego or a mere instrumentality, which appears to be a sufficient basis to impose liability for the transfer under Georgia law.

While the parties devote much effort in disputing whether the abstract notion of "control" or "value" may be considered an

AO 72A
(Rev. 8/82)

"asset" under the UFTA, it appears that PBI's proportional ownership interest in the Bank—the interest directly impacted by the stock issuance—squarely falls within the type of "asset" or "interest in an asset" contemplated by the UFTA. See id. § 18-2-71(12) (stating that a "transfer" involves "parting with an asset or an interest in an asset"). PBI's ownership interest constitutes an "asset" under the UFTA, as it is the "property of a debtor." See id. § 18-2-71(2). An ownership interest may be considered "property," because the interest itself may be sold or transferred for value and, thus, "may be the subject of ownership." See id. § 18-2-71(10). That an ownership interest is intangible in nature does not change this result, as even intangible property such as goodwill, or the subjective value of a business, has been found to constitute "property," the fraudulent transfer of which gives rise to a claim pursuant to the UFTA. See Jones, 503 B.R. at 182-84 (noting that goodwill, though intangible, has substantial value).

Additionally, or alternatively, PBI's ownership interest in the Bank may be viewed as an "interest in an asset" rather than an "asset" itself. The Bank is an "asset," as it is undisputed that the Bank was the "property of a debtor," PBI, and subsequently became the subject of ownership by other stockholders as well. See O.C.G.A. § 18-2-71(2), (10). Thus, Plaintiff plausibly demonstrates that PBI held an ownership

AO 72A
(Rev. 8/82)

interest in the Bank, and this interest constitutes an "asset" or "interest in an asset" under the plain language of the UFTA.

Accordingly, Plaintiff sufficiently pleads this element of a fraudulent transfer claim by showing that a transfer of an asset occurred.

### 3. **Actual Fraud**

In addition to the debtor's transfer of an asset, a prima facie case of fraudulent transfer requires that the transfer be made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." See id. § 18-2-74(a)(1); Kipperman, 411 B.R. at 829. "Proof of actual intent can rarely be accomplished by direct evidence, therefore, the court allows fact finders to 'infer fraudulent conduct from the circumstantial evidence and the surrounding circumstances of the transactions.'" Kipperman, 411 B.R. at 853 (quoting In re XYZ Options, Inc., 154 F.3d 1262, 1271 (11th Cir. 1998)). To this end, the UFTA instructs courts to consider whether any "badges of fraud" are present in the transaction, including whether

> (1) [t]he transfer or obligation was to an insider;
> (2) [t]he debtor retained possession or control of the property transferred after the transfer;
> (3) [t]he transfer or obligation was disclosed or concealed;
> (4) [b]efore the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (5) [t]he transfer was of substantially all the debtor's assets;
> (6) [t]he debtor absconded;

AO 72A
(Rev. 8/82)

(7) [t]he debtor removed or concealed assets;
(8) [t]he value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) [t]he debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) [t]he transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) [t]he debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

O.C.G.A. § 18-2-74(b); see also Bishop, 706 S.E.2d at 641 ("The issue of fraud is commonly determined by certain recognized indicia, denominated 'badges of fraud,' which are circumstances so frequently attending fraudulent transfers that an inference of fraud arises from them." (quoting United States v. Leggett, 292 F.2d 423, 426 (6th Cir. 1961))).

"[P]roof of some, or even all, of the factors listed in the [UFTA] does not create a presumption of actual intent to defraud." Kipperman v. Onex Corp., No. 1:05-CV-01242-JOF, 2010 WL 761227, at *4 (N.D. Ga. Mar. 2, 2010) (quoting Lindholm v. Holtz, 581 N.E.2d 860 (Ill. Ct. App. 1991)). Rather, the badges of fraud "are indicators of such intent on which the trial court may rely to make its findings based on evidence presented by the parties." Id. (quoting Lindholm, 581 N.E.2d at 860). As such, "[t]here is no magic formulation" in considering the badges of fraud—"[o]ne badge may be enough; many badges may not be enough." Id.

Plaintiff's Amended Complaint plausibly demonstrates that at least five badges of fraud are present in this case. First, Plaintiff suggests that the "transfer or obligation was to an insider" in alleging that the Director Defendants held stock in PBI and that the new shares of stock in the Bank were issued "to current holders of PBI's stock and their friends and famil[ies]." Dkt. No. 49, ¶¶ 17, 19, 21, 84; see also O.C.G.A. § 18-2-71(7)(B)(vi) (defining "insider" as encompassing any "relative of a general partner, director, officer, or person in control of the debtor"); id. § 18-2-74(b)(1). Additionally, Plaintiff contends that PBI was worried "that the scheme would be discovered prior to its consummation" and, therefore, concealed the stock issuance from the Trustee, Plaintiff, and the general public. Dkt. No. 49, ¶ 85; see also O.C.G.A. § 18-2-74(b)(3).

Moreover, Plaintiff asserts that the Bank was PBI's primary asset, such that the transfer of PBI ownership interest therein constituted a transfer "of substantially all the debtor's assets." Dkt. No. 49, ¶¶ 52, 61, 120, 122; see also O.C.G.A. § 18-2-74(b)(5). In support, Plaintiff avers that following the stock sale, "PBI's interest in the Bank went from 100% to less than 1%, or from a book value of $2,844,000 to just $68,000," and that PBI "was left as a shell holding company with no real assets and no way to repay its liabilities to [Plaintiff]."

AO 72A
(Rev. 8/82)

Dkt. No. 49, ¶¶ 86, 92. Further, Plaintiff alleges that PBI did not receive "reasonably equivalent" value for the amount of its ownership interest that was transferred to the stockholders, stating that PBI, in fact, "did not receive any payment or other value" in the transaction. Id. at ¶ 87; see also O.C.G.A. § 18-2-74(b)(8). Finally, Plaintiff states that PBI was insolvent at the time of the transfer, as PBI's balance sheet showed $6,865,000 of liabilities (including the TruPS debt) and only $3,042,000 of assets (of which $2,844,000 was its 100% investment in the Bank), leaving the stockholders' equity at negative $3,823,000. Dkt. No. 49, ¶ 73; see also O.C.G.A. § 18-2-74(b)(9).

PBI and the Bank emphasize that a stock sale not only is legal but also was necessary for the Bank in this case to withstand the financial pressures of an economic recession occurring during that time. Dkt. No. 41, pp. 2-3 (citing O.C.G.A. § 7-1-288). The Bank's ability to issue stock under Georgia law, however, would not neutralize the invalid nature of the stock issuance if designed to defraud creditors. See 37 C.J.S. Fraudulent Conveyances, supra, § 22 ("Whatever may be the external form of the transaction, if its design is to defraud creditors, it is invalid." (citing Birmingham Tr. & Sav. Co., 163 So. at 593, and Leifer, 267 N.Y.S. at 701). Moreover, construing the facts in favor of Plaintiff, as the Court must at

AO 72A
(Rev. 8/82)

this stage, Plaintiff demonstrates that PBI and the Bank implemented a transfer containing several indicia of fraud.

The Court is satisfied that Plaintiff adequately pleads certain "badges of fraud" sufficient to sustain a fraudulent transfer claim based on actual fraud. See Gordon v. Graybeal, No. 10-06105-MGD, 2010 Bankr. LEXIS 2547, at *7-8 (Bankr. N.D. Ga. June 21, 2010) (finding that the plaintiff's pleading of certain "badges of fraud" was sufficient to survive dismissal of his claims under an actual fraud theory). While Defendants maintain that Plaintiff must plead fraud with particularity as required under Federal Rule of Civil Procedure 9(b), dkt. no. 21, pp. 14-15, this Court has previously determined that this requirement does not apply to fraudulent transfer claims brought under the UFTA, and declines to depart from that ruling here, see Nesco, Inc. v. Cisco, No. CIV.A. CV205-142, 2005 WL 2493353, at *2-3 (S.D. Ga. Oct. 7, 2005) (distinguishing common-law fraud from fraudulent transfer). Moreover, even if the Court were to apply that rule here, it appears that Plaintiff's allegations nevertheless would satisfy the heightened pleading standard thereunder. See id. at *2 (stating that a pleading must "alert[] defendants to the 'precise misconduct with which they are charged'" (quoting Brooks, 116 F.3d at 1371, and Durham v. Bus. Mgmt. Assocs., 847 F.2d 1505, 1511 (11th Cir. 1988))).

### 4.  Constructive Fraud

As to constructive fraud, the remaining elements include that the debtor must have received "less than reasonably equivalent value" in consideration for the asset transferred, and must have been insolvent at that time or became insolvent thereafter.  See O.C.G.A. §§ 18-2-74(a)(2), 18-2-75(a); Kipperman, 411 B.R. at 828.

As discussed in the previous Subpart with regard to actual fraud, Plaintiff's allegations are sufficient to satisfy these elements at this time.

### 5.  **Conclusion**

Because Plaintiff pleads facts supporting each element of fraudulent transfer claims based on actual and constructive fraud, Plaintiff successfully demonstrates that recovery on these claims is plausible.  Accordingly, PBI's and the Bank's Motions to Dismiss (dkt. nos. 21, 24) are **DENIED** to the extent that they relate to Plaintiff's fraudulent transfer claims in Count I.

### B. Count II: **Tortious Interference**

In Count II, Plaintiff alleges that Community Capital tortiously interfered with PBI's contractual obligations to the Trust and, ultimately, to Plaintiff.  Dkt. No. 49, ¶¶ 127-37.

Georgia law permits recovery in tort for a third party's interference, without legal justification or privilege, with another's contractual or business relations.  See O.C.G.A. § 51-

AO 72A
(Rev. 8/82)

12-30; <u>Atlanta Mkt. Ctr. Mgmt., Co. v. McLane</u>, 503 S.E.2d 278, 282 (Ga. 1998). To recover on a claim of tortious interference with contract, a plaintiff must prove the following:

> (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third part[y] to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

<u>Mabra v. SF, Inc.</u>, 728 S.E.2d 737, 739-40 (Ga. Ct. App. 2012) (alteration in original) (quoting <u>Tidikis v. Network for Med. Commc'ns & Research, LLC</u>, 619 S.E.2d 481, 486 (Ga. Ct. App. 2005)); <u>see also</u> <u>Williams v. Church's Fried Chicken, Inc.</u>, 279 S.E.2d 465, 470 (Ga. Ct. App. 1981) (summarizing tortious interference with contractual relations or potential business relations as the "malicious, wrongful and intentional injury to the business of another" (citing <u>NAACP v. Overstreet</u>, 142 S.E.2d 816 (Ga. 1966))).

## 1. **Improper Action or Wrongful Conduct Without Privilege**

"Improper actions constitute conduct wrongful in itself; thus, improper conduct means wrongful action that 'generally involve[s] predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions.'"

Disaster Servs., Inc. v. ERC P'ship, 492 S.E.2d 526, 529 (Ga. Ct. App. 1997) (alterations in original) (quoting Am. Bldgs. Co. v. Pascoe Bldg. Sys., 392 S.E.2d 860 (Ga. 1990)). However, this list of improper actions is not exhaustive, as Georgia courts have found other types of conduct sufficiently wrongful to impose liability for tortious interference. See, e.g., Carroll Anesthesia Assocs., P.C. v. AnestheCare, Inc., 507 S.E.2d 829, 832 (Ga. Ct. App. 1998) (finding a jury issue as to whether a third party "induced and encouraged" a contracting party's employees to breach their employment contracts, so as to warrant liability for tortious interference with contract); Artrac Corp. v. Austin Kelley Advert., Inc., 399 S.E.2d 529, 532 (Ga. Ct. App. 1990) (finding that genuine issues of material fact remained as to a third party's tortious interference with contract, where the third party was aware of a contracting party's debt to another and nevertheless assisted in fraudulently transferring the party's assets so as to avoid its obligations to its creditor).

Plaintiff's allegations plausibly establish improper action on the part of Community Capital. According to Plaintiff, the Bank hired Community Capital, "a consulting firm that specializes in assisting community banks [with] rais[ing] capital," to advise the Bank and to help execute its capital raise. Dkt. No. 49, ¶¶ 82, 132. Plaintiff alleges that

"Community Capital knew that PBI had over $3 million in obligations on the TruPS and was familiar with the contractual obligations to the Trust and [Plaintiff]." Id. at ¶ 131. Plaintiff further contends that PBI "knew that the purpose of the [stock issuance] was, and the effect of the transaction would be, to injure [Plaintiff]." Id. at ¶ 133. Plaintiff further states that Community Capital "advised the Director Defendants on the structure of the transaction," which included "ha[ving] the Bank issue new stock in a private placement to transfer what was effectively more than a 99% interest in PBI's assets." Id. at ¶¶ 83, 134. By alleging that Community Capital was aware of PBI's debt owing on the TruPS, and nevertheless assisted in executing a stock issuance designed to avoid PBI's repayment obligations, Plaintiff sufficiently demonstrates wrongful conduct to support a tortious interference claim against Community Capital.

Community Capital argues that its conduct cannot be considered wrongful, because it simply helped the Bank exercise its legal right to issue stock. Dkt. No. 16, p. 8 (citing O.C.G.A. § 7-1-288). It is true that Georgia recognizes that a third party's "exercise of an absolute legal right is not and cannot be considered an interference" with a contractual relationship. Disaster Servs., Inc., 492 S.E.2d at 529 (finding that a third party, who was not a party to the plaintiff's

AO 72A
(Rev. 8/82)

contract for services with another company, did not tortiously interfere with that contract by exercising its legal right to amend and terminate its own preexisting contract with that company, notwithstanding the incidental harm caused to the plaintiff). However, nothing in this case suggests that Community Capital had a legal right to engage in the conduct underlying Plaintiff's tortious interference claim—namely, its actions in advising on, and assisting with the execution of, a plan that would cause PBI to violate its contractual obligations to its creditor.

To prove the second part of this element—that the defendant acted "without privilege"—a plaintiff must show that the defendant "was a stranger to the contract or business relation at issue." Mabra, 728 S.E.2d at 740 (citing ASC Constr. Equip. USA, Inc. v. City Commercial Real Estate, Inc., 693 S.E.2d 559 (Ga. Ct. App. 2010)). Under the "stranger doctrine," "only a stranger to both the contract at issue and the business relationship giving rise to and underpinning the contract may be liable for tortious interference [with the contract or the relationship]." Id. (alterations in original) (quoting Perry Golf Course Dev., LLC v. Housing Auth. of Atlanta, 670 S.E.2d 171 (Ga. Ct. App. 2008), and Atlanta Mkt. Ctr. Mgmt., Co., 503 S.E.2d at 278). Thus, while a third party is not necessarily a "stranger" to the contract simply because he is not a party to

the contract, the third party must have "a direct economic interest in or [be in a position to] benefit from a contract with which [he is] alleged to have interfered" to be exempt from liability under the stranger doctrine. Id. (citing Atlanta Mkt. Ctr. Mgmt., Co., 503 S.E.2d at 278).

Plaintiff's Amended Complaint contains sufficient facts demonstrating that Community Capital acted without privilege. Indeed, Plaintiff shows that Community Capital was a stranger to the contract at issue—the Indenture—in alleging that only PBI and the Trustee executed the Indenture and that the Indenture governed only the Debt Securities purchased from PBI and PBI's obligations thereon. Dkt. No. 49, ¶¶ 40-42. In addition, Plaintiff claims that Community Capital was a stranger to each of the contractual agreements between PBI, the Trust, and Plaintiff. Id. at ¶ 136. Further, Plaintiff alleges that Community Capital was hired by the Bank to assist in its capital raise, id. at ¶ 82, and, as such, the record is devoid of any facts suggesting that Community Capital had a direct economic interest in, or stood to benefit from, the Indenture agreement between PBI and the Trust.

Community Capital cites Benefit Support, Inc. v. Hall Cty., 637 S.E.2d 763 (Ga. Ct. App. 2006), for the proposition that a "consultant hired by a party to perform actions that form the basis of the complaint is not a stranger to the parties'

relationship." Dkt. No. 16, p. 11. However, Community Capital's characterization of this case is incomplete. In Benefit Support, Inc., the Georgia Court of Appeals stated that, "[w]here the defendant is the entity the third party hires to administer, operate, or promote the event that forms the basis for the business relationship between the plaintiff and the third party, the defendant is no stranger to that relationship and cannot be held liable for interfering therewith." 637 S.E.2d at 770. While perhaps Benefit Support, Inc. would apply to shield Community Capital from liability had it been hired to advise PBI regarding the issuance of the Debt Securities under the Indenture, that is not the case here. Rather, under the facts alleged by Plaintiff, Community Capital's role as a consultant assisting the Bank had no impact on its status as a stranger to the Indenture and the business relationship between PBI and the Trust.

Accordingly, Plaintiff's Amended Complaint sufficiently pleads improper action or wrongful conduct without privilege to sustain a tortious interference claim.

## 2. **Purpose, Malice, and Intent to Injure**

The second element of a prima facie case of tortious interference is that the defendant must have "acted purposely and with malice with the intent to injure." Mabra, 728 S.E.2d at 739 (quoting Tidikis, 619 S.E.2d at 486). An action is

"malicious" when it is taken "with the knowledge of [the] plaintiff's rights, and with the intent to interfere therewith." Insight Tech., Inc. v. FreightCheck, LLC, 633 S.E.2d 373, 379 (Ga. Ct. App. 2006). Thus, "[p]ersonal ill will or animosity is not essential"; rather, "any unauthorized interference, or any interference without legal justification or excuse," will suffice. Id. (stating that "[p]ersuading a person to break a contract for the indirect purpose of injuring the plaintiff or benefiting the defendant at the expense of the plaintiff is a malicious and actionable act if injury arises from it").

In the case at bar, Plaintiff presents allegations indicating that Community Capital, in assisting with the stock transaction, acted with purpose and with malice and intent to injure Plaintiff. Plaintiff alleges that Community Capital is a "consulting firm that specializes in assisting community banks [with] rais[ing] capital" and is familiar with TruPS issuances. Dkt. No. 49, ¶¶ 82, 131. Plaintiff also states that Community Capital worked with the Director Defendants, who served as directors of both PBI and the Bank, to structure the stock transaction. Id. at ¶¶ 82-83, 134. Accordingly, Plaintiff concludes, and the Court agrees, that these allegations are sufficient to support an inference that Community Capital had knowledge of PBI's contractual obligations to Plaintiff. Dkt. No. 49, ¶ 131. Under such circumstances, Community Capital's

assistance in a transaction causing PBI to violate that contract, and leave Plaintiff without any return on its investment, would be fairly considered purposeful, malicious, and intending to injure Plaintiff.

### 3. Remaining Elements[9]

As the third element of a tortious interference claim, a plaintiff must prove that the defendant "induced a breach of contractual obligations or caused a party or third part[y] to discontinue or fail to enter into an anticipated business relationship with the plaintiff." Mabra, 728 S.E.2d at 739 (quoting Tidikis, 619 S.E.2d at 486). The fourth, and final, element is that the defendant's tortious conduct must "proximately cause[] damage to the plaintiff." Id. (quoting Tidikis, 619 S.E.2d at 486).

Plaintiff's Amended Complaint makes an adequate showing, at this stage, that Community Capital induced PBI to breach its contractual obligations owed to Plaintiff under the Indenture. Plaintiff alleges that PBI and the Trustee executed the Indenture, which sets forth PBI's obligations with regard to the Debt Securities. Dkt. No. 49, ¶¶ 40-42. Plaintiff states that the structure of PBI's payment obligations to the Trust, and the Trust's payment obligations to Plaintiff, are such that

---

[9] The Court notes that Community Capital does not specifically contest the sufficiency of the remaining elements of Plaintiff's tortious interference claim. See Dkt. No. 16.

Plaintiff is an intended third-party beneficiary of the Indenture. Id. at ¶ 43. Further, Plaintiff alleges that PBI breached its contractual obligations to the Trust and to Plaintiff, in part by conspiring with the Bank and causing it to issue stock to investors, effectively transferring 99% of PBI's ownership interest in the Bank to individuals who did not assume any repayment obligation on the TruPS. Id. at ¶¶ 106-08, 170-82. Based on Plaintiff's allegations of Community Capital's role as an advisor to PBI and the Bank's planning and execution of the stock issuance, id. at ¶¶ 82-83, 134, Plaintiff sets forth sufficient facts showing that Community Capital's actions induced PBI to breach the Indenture or caused the business relationship between PBI and Plaintiff to fail.

In addition, Plaintiff demonstrates that Community Capital's conduct proximately caused damage to Plaintiff under the fourth element. Plaintiff avers that at the time of the stock sale, "nearly $3.7 million had accrued and was owing with respect to [PBI's] past due interest payments." Id. at ¶¶ 112-13. Plaintiff further shows that following the stock sale, PBI "was left as a shell holding company with no real assets and no way to repay its liabilities to [Plaintiff]." Id. at ¶ 92. Plaintiff claims that it received nothing in the transaction and that its interests were harmed as a result thereof. Id. at ¶ 88. To the extent that Plaintiff alleges that Community Capital

assisted in effectuating the stock sale, id. at ¶¶ 82-83, 134,
it appears that there is sufficient support for Plaintiff's
claim that Community Capital's actions proximately caused the
alleged damage.

Accordingly, the portions of Community Capital's Motions to
Dismiss relating to Count II of the Amended Complaint (dkt. nos.
16, 56) must be **DENIED** at this time, given that Plaintiff
presents sufficient factual allegations to sustain a claim of
tortious interference with contract.

### C. Count III: Breach of Fiduciary Duty

Plaintiff alleges in Count III that the Director Defendants
breached their fiduciary duties to the creditors of PBI,
including Plaintiff as beneficial owner of the TruPS. Dkt. No.
49, ¶¶ 138-56.

A fiduciary or confidential relationship arises "where one
party is so situated as to exercise a controlling influence over
the will, conduct, and interest of another or where, from a
similar relationship of mutual confidence, the law requires the
utmost good faith, such as the relationship between partners,
principal and agent, etc." O.C.G.A. § 23-2-58; Wright v.
Apartment Inv. & Mgmt. Co., 726 S.E.2d 779, 785 (Ga. Ct. App.
2012). A fiduciary relationship "may be created by law,
contract, or the facts of a particular case. Wright, 726 S.E.2d
at 785-86.

To recover for breach of a fiduciary duty, a plaintiff must demonstrate the existence of such duty, the breach of that duty, and damages proximately caused by the breach. Id. (citing Bienert v. Dickerson, 624 S.E.2d 245, 249 (Ga. Ct. App. 2005)). "When a fiduciary relationship exists, the agent may not make a profit for himself out of the relationship to the injury of the principal." Id.

Relevant here is that "Georgia courts have recognized that the managing officers and directors of a corporation 'are charged with the duty of conserving and managing the remaining assets [of an insolvent corporation] in trust for the creditors.'" Tindall v. H & S Homes, LLC, No. 5:10-CV-044 CAR, 2011 WL 5827227, at *2 (M.D. Ga. Nov. 18, 2011) (alteration in original) (quoting In re Pharr-Luke, 259 B.R. 426, 430 (Bankr. S.D. Ga. 2000)). Accordingly, "[w]hen a corporation becomes insolvent its directors are 'bound to manage the remaining assets for the benefits of its creditors, and cannot in any manner use their powers for the purpose of obtaining a preference or advantage to themselves.'" Hickman v. Hyzer, 401 S.E.2d 738, 740 (Ga. 1991) (quoting Ware v. Rankin, 104 S.E.2d 555, 558 (Ga. Ct. App. 1958)). Thus, corporate officers and directors "may not 'give preference to existing debts which the corporation owed to other persons, and for which such officers [and directors] were primarily liable,'" unless a preference or

payment is "made in the performance of [an] agreement . . .
entered into at or prior to the time when the liabilities [to
the creditors] were incurred, or before the insolvency of the
corporation." Tindall, 2011 WL 5827227, at *3 (second
alteration in original) (quoting Fountain v. Burke, 287 S.E.2d
39, 39 (Ga. Ct. App. 1981)).

Consistent with this duty, "any scheme or device the
purpose of which is to indemnify [the owners, officers, or
directors of a corporation] against loss, whether as creditors
or as endorsers of notes given by the corporation or otherwise,
constitutes legal fraud." Id. (alteration in original)
(quoting Ware, 104 S.E.2d 555). "Creditors thus 'have a right
to sue the officers and directors of the corporation' when this
type of misconduct occurs." Id. (quoting Hickman, 401 S.E.2d at
738, and McEwen v. Kelly, 79 S.E. 777 (Ga. Ct. App. 1913)); see
also Hickman, 401 S.E.2d at 738 ("The abuse of this duty gives
rise to an action against the directors to recover sums
improperly paid out by the corporation." (citing Ware, 104
S.E.2d at 555)).

Plaintiff presents the Court with sufficient facts to
support a claim of breach of fiduciary duty against the Director
Defendants. Plaintiff alleges that the Director Defendants'
fiduciary duties arose by virtue of the Bank's insolvency. Dkt.
No. 49, ¶ 144. Pertinently, Plaintiff contends that PBI became

AO 72A
(Rev. 8/82)

insolvent prior to the Bank's stock sale in March 2013. Id. at ¶¶ 72, 84. According to Plaintiff, PBI deferred on its quarterly interest payments to Plaintiff beginning in March 2010. Id. at ¶ 65. Plaintiff also states that PBI's income statement for 2012 reported a net loss of $887,000, and its balance sheet reflected $6,865,000 of liabilities and only $3,042,000 of assets, leaving the stockholders' equity at negative $3,823,000. Id. at ¶ 73. Construing these allegations as true, the Court could find the existence of a fiduciary relationship that required that the Director Defendants conserve and manage PBI's assets in trust for the benefit of its creditors, including Plaintiff.

Additionally, Plaintiff claims that the Director Defendants breached these duties by "devis[ing] a scheme to allow PBI's stockholders to position themselves ahead of [Plaintiff], and to protect [their] positions with PBI and the Bank and [their] reputation[s] within the community." Id. at ¶ 81. Plaintiff contends that the Director Defendants should have declared bankruptcy upon PBI's insolvency in order to ensure that its creditors received some return on their investments through a judicially supervised bank sale. Id. at ¶ 74. Instead, Plaintiff maintains that the Director Defendants, "acting as directors of both PBI and the Bank and with the assistance of Community Capital, had the Bank issue new stock in a private

AO 72A
(Rev. 8/82)

placement to transfer what was effectively more than a 99%
interest in PBI's assets" to "current holders of PBI's stock and
their friends and famil[ies]." Id. at ¶¶ 83-84. As a result,
Plaintiff alleges that it was left "without the ability to look
to that asset as a source of funds for repayment" on the TruPS.
Id. at ¶ 120. These allegations plausibly demonstrate that the
Director Defendants breached their fiduciary duties and
proximately caused damages to Plaintiff. See Tindall, 2011 WL
5827227, at *2 (finding that the plaintiff sufficiently stated a
claim of breach of fiduciary duty under Georgia law in alleging
that the director defendants transferred the insolvent
corporation's assets to its subsidiary); Ware, 104 S.E.2d at 559
(finding that the plaintiff sufficiently alleged breach of
fiduciary duty by stating that the director defendants of an
insolvent corporation made payments so as to indemnify
themselves against any loss).

Defendants' arguments based on the Director Defendants'
authority under Georgia corporate and banking law do not change
this result. See Dkt. No. 24, p. 4 (citing O.C.G.A. §§ 7-1-
416(a), 14-2-1201 and Tallant v. Exec. Equities, Inc., 209
S.E.2d 159, 161 (Ga. 1974)). Indeed, Georgia law permits
corporate directors to sell corporate property without
shareholder approval when the corporation is insolvent, O.C.G.A.
§ 14-2-1201(b)-(c); allows corporate directors to issue stock

AO 72A
(Rev. 8/82)

even if it dilutes the existing shareholders' ownership interests, <u>Tallant</u>, 209 S.E.2d at 159; and authorizes the directors of a bank to issue stock without shareholder approval, O.C.G.A. § 7-1-416(a). Even so, these provisions do not specifically account for circumstances in which the directors hold positions in another corporation, the interests of which may be affected by the transaction, or owe fiduciary duties to the shareholders of another corporation. Moreover, these provisions cannot be intended to provide directors with an unfettered right to sell corporate property or issue stock in those circumstances, even if it is in direct contravention of their contractual or fiduciary duties.

Similarly unavailing is Defendants' argument that the exculpatory clause of the Indenture shields them from liability for breaching their fiduciary duties. <u>See</u> Dkt. No. 50, pp. 5-10. The Indenture, entered into by PBI and the Trust, states that the Trust, and thus Plaintiff, has "[n]o recourse for the payment of the principal of or premium, if any, or interest on any Debt Security, or for any claim based thereon or otherwise in respect thereof," against any officer or director of PBI. Dkt. No. 50-2, p. 56. The Indenture further denies recourse against PBI's officers and directors "under or upon any obligation, covenant or agreement of [PBI] in this Indenture or in any supplemental indenture, or in any such Debt Security."

Id.

Significantly, Plaintiff does not seek payment of the principal, premium, or interest on the Debt Securities from the Director Defendants, nor does Plaintiff seek to hold the Director Defendants liable for PBI's alleged breach of its obligations under the Indenture. Rather, Plaintiff claims entitlement to damages on the basis that the Director Defendants themselves breached duties personally owed to Plaintiff as a creditor of the insolvent corporation. Because the exculpatory clause contemplates only PBI's obligations set forth in the Indenture, and not the Director Defendants' duties independently arising at law, the provision does not immunize the Director Defendants in this case.[10]

For these reasons, the portions of the Director Defendants' Motions to Dismiss relating to Plaintiff's breach of fiduciary duty claims in Count III (dkt. nos. 24, 50) are **DENIED**.

### D. Count IV: Aiding and Abetting Breach of Fiduciary Duty

In Count IV, Plaintiff asserts claims against the Bank and Community Capital for aiding and abetting the Director Defendants' breach of their fiduciary duties. Dkt. No. 49, ¶¶ 157-69.

---

[10] The parties dispute whether the Indenture is governed by Georgia or New York law, for the purpose of determining the enforceability of the exculpatory clause under the applicable law. See Dkt. Nos. 50, 53. However, because it is clear from the plain language of the exculpatory clause that it does not encompass the type of claims that Plaintiff asserts here, the Court need not reach this issue.

AO 72A
(Rev. 8/82)

Georgia law allows recovery in tort for aiding and abetting a breach of fiduciary duty, though Georgia courts sometimes refer to this concept interchangeably as "procuring a breach of fiduciary duty" or "tortious interference with fiduciary relationship." See O.C.G.A. § 51-12-30; Insight Tech., Inc., 633 S.E.2d at 379. Regardless of the nomenclature, recovery under this theory requires proving that

> (1) through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Insight Tech., Inc., 633 S.E.2d at 378-79 (explaining the origin of these elements as being those of the related tort of tortious interference with contractual or business relations).

### 1. **Improper Action or Wrongful Conduct, Without Privilege, to Procure a Breach of Fiduciary Duty**

"Improper actions constitute conduct wrongful in itself; thus, improper conduct means wrongful action that generally involves predatory tactics such as physical violence, fraud or misrepresentation, defamation, use of confidential information, abusive civil suits, and unwarranted criminal prosecutions." White v. Shamrock Bldg. Sys., Inc., 669 S.E.2d 168, 172-73 (Ga.

Ct. App. 2008) (quoting Disaster Servs. Inc., 492 S.E.2d at 526)).

In the Georgia Court of Appeals case Nalley v. Langdale, the beneficiaries of a trust alleged that the officers and directors of the defendant company "conspired with the trustees to induce the income beneficiaries to sell their stock to [the company] at a discount," thereby aiding and abetting the trustees' breach of their fiduciary duties. 734 S.E.2d 908, 921 (Ga. Ct. App. 2012). The Georgia Court of Appeals reversed the trial court's grant of summary judgment in favor of the company, because the trust beneficiaries offered sufficient evidence in support of its claim to create a triable jury issue. Id. at 921-22. In particular, the appellate court found that the beneficiaries had established improper action or wrongful conduct through evidence showing that the stock was undervalued at the time of the sale and that the company had kept the sale a secret prior to its consummation to discourage other potential buyers and prevent anyone from spoiling the deal. Id.

Plaintiff's factual allegations, accepted as true, are sufficient to support a finding of improper action or wrongful conduct on the part of Community Capital and the Bank. Similar to the beneficiaries' claims in Nalley, Plaintiff alleges that Community Capital and the Bank conspired with PBI and the Director Defendants to structure and execute a stock issuance

that would breach PBI's contractual obligations, as well as the Director Defendants' fiduciary duties, to Plaintiff as creditor of PBI. See Dkt. No. 49, ¶¶ 158-59. While Plaintiff's factual allegations do not include the price at which the stock was sold to the holders of PBI's stock and their friends and families, it is significant that, according to Plaintiff's allegations, the sale was structured such that PBI, and, ultimately, Plaintiff, received nothing for the transfer of ownership, while the Bank and the Director Defendants profited from the transaction. See id. at ¶¶ 81, 84, 87-88. Moreover, Plaintiff asserts that the parties kept the stock sale a secret, out of concern "that the scheme would be discovered prior to its consummation" and in an attempt "to prevent Plaintiff from seeking injunctive relief." Id. at ¶ 85. Consistent with the decision in Nalley, these allegations are sufficient, at this stage, to support an inference of improper action or wrongful conduct on the part of Community Capital and the Bank.

Defendants' argument that their conduct cannot be considered wrongful based on the lawful nature of a stock issuance, see dkt. no. 16, p. 14; dkt. no. 21, pp. 17-18 (citing O.C.G.A. § 7-1-288(a)), is unconvincing. While perhaps Georgia courts would recognize the exercise of an absolute legal right as barring liability for aiding and abetting a breach of fiduciary duty, as done in the context of tortious interference

AO 72A
(Rev. 8/82)

with contract, see Disaster Servs., Inc., 492 S.E.2d at 529,

nothing suggests that Community Capital or the Bank had any

legal right to assist PBI and the Director Defendants in

carrying out a stock issuance in direct contravention of the

Director Defendants' fiduciary duties to Plaintiff. Nor is the

Court persuaded by the Bank's argument that the FDIC's Consent

Order constituted "legal justification" for the stock issuance,

see dkt. no. 21, p. 18 (citing Renden, Inc. v. Liberty Real

Estate Ltd. P'ship III, 444 S.E.2d 814, 817 (Ga. Ct. App.

1994)), as the Consent Order neither directed the Bank to sell

stock as its sole means of raising capital nor authorized doing

so at the expense of another's legal rights.

In determining whether a defendant acted "without

privilege" in aiding a breach of fiduciary duty, the Georgia

Court of Appeals has instructed courts to apply the stranger

doctrine. See Am. Mgmt. Servs. E., LLC v. Fort Benning Family

Cmtys., LLC, No. A15A0125, 2015 WL 4255779, at *15-16 (Ga. Ct.

App. July 15, 2015). As such, liability for aiding and abetting

a breach of fiduciary duty requires that the defendant be a

stranger to both the contract at issue and the business

relationship giving rise to and underpinning the contract. Id.

(citing Atlanta Mkt. Ctr. Mgmt., Co., 503 S.E.2d at 278)

(holding that a parent company was not liable for aiding and

abetting a breach of fiduciary duty by its subsidiary, because

the parent company was not a stranger to the business relationship between its subsidiary and the plaintiff giving rise to and underpinning the contract). Presumably, then, "part[ies] to an interwoven contractual agreement," as well as a party having "a direct economic interest in" or standing in a position to benefit from a contract or business relationship, cannot be held liable for aiding or abetting the breach of a fiduciary duty associated therewith. See Atlanta Mkt. Ctr. Mgmt., Co., 503 S.E.2d at 283-84.

Plaintiff's Amended Complaint adequately alleges that Community Capital acted without privilege. Plaintiff pleads facts tending to show that Community Capital was a stranger to both the interwoven contractual agreements between PBI, the Trust, and Plaintiff concerning the TruPS as well as the underlying business relationship between PBI, acting through the Director Defendants, and Plaintiff. See Dkt. No. 49, ¶¶ 32, 40. Plaintiff alleges that the Bank hired Community Capital to assist in structuring and executing a stock sale for the purpose of raising capital. Id. at ¶¶ 82-83. While Community Capital allegedly collaborated with PBI and the Director Defendants to accomplish this end, id. at ¶ 83, the facts do not suggest that Community Capital had a direct economic interest in, or stood to benefit from, PBI and the Director Defendants' business relationship with PBI's creditors, including Plaintiff.

AO 72A
(Rev. 8/82)

With respect to the Bank, however, Plaintiff fails to demonstrate that the allegedly wrongful conduct was without privilege. Rather, Plaintiff's allegations indicate that the Bank was not a stranger to the business relationship between its parent company, PBI; its directors, who, incidentally, were also the Bank's directors; and Plaintiff. Indeed, Plaintiff shows that the Bank had a direct economic interest in the Director Defendants' relationship with PBI's creditors, including Plaintiff, in alleging that (1) the Bank was the wholly-owned subsidiary of PBI, id. at ¶¶ 3-4; (2) PBI had become insolvent, id. at ¶ 91; (3) the Director Defendants had a fiduciary to maintain PBI's assets for the benefit of its creditors, including Plaintiff, id. at ¶¶ 138-56; and (4) Plaintiff could look to "the assets of [PBI's] wholly-owned subsidiary, the Bank, to satisfy and secure repayment obligations to [Plaintiff]," id. at ¶ 51. As such, the Bank's actions in working with the Director Defendants to effect a stock sale cannot, as a matter of law, give rise to liability for aiding and abetting the Director Defendants' alleged breach of their fiduciary duties resulting therefrom.

Thus, Plaintiff succeeds in establishing this element of its claim against Community Capital. However, Plaintiff's failure to do so with regard to the Bank is fatal to its aiding and abetting claim against this Defendant.

AO 72A
(Rev. 8/82)

## 2. **Remaining Elements**[11]

The second element necessary to recover for aiding and abetting breach of a fiduciary duty requires that, "with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure." Insight Tech., Inc., 633 S.E.2d at 379 (stating that an action is "malicious" when it is taken "with the knowledge of [the] plaintiff's rights, and with the intent to interfere therewith").

Plaintiff adequately alleges the second element of its claim against Community Capital. Plaintiff states that Community Capital is a "consulting firm that specializes in assisting community banks [with] rais[ing] capital" and is familiar with TruPS issuances. Dkt. No. 49, ¶¶ 82, 168. Plaintiff also states that Community Capital worked with the Director Defendants, who served as directors of both PBI and the Bank, to structure the stock transaction. Id. at ¶¶ 82-83, 163. These facts are sufficient to support an inference that Community Capital had knowledge of PBI's contractual obligations on the TruPS as well as its financial state and, therefore, was aware that the Director Defendants owed fiduciary duties to PBI's creditors, including Plaintiff in particular. Id. at ¶

---

[11]  Notable here is that Community Capital does not contest the sufficiency of Plaintiff's pleading of the remaining elements of this claim. See Dkt. No. 16.

AO 72A
(Rev. 8/82)

162. Plaintiff further alleges that Community Capital assisted the Director Defendants in effectuating a transaction that caused the Director Defendants to breach those duties. Id. at ¶ 165. These allegations sufficiently establish that Community Capital acted with knowledge, purpose, malice, and intent to injure Plaintiff.

Under the third element, the defendant's wrongful conduct must have "procured a breach of the primary wrongdoer's fiduciary duty." Insight Tech., Inc., 633 S.E.2d at 379. For the reasons discussed above and in Subpart II.C, Plaintiff makes a plausible showing that the Director Defendants, with the assistance of Community Capital, breached their fiduciary duties to Plaintiff.

The fourth and final element of this claim includes that "the defendant's tortious conduct proximately caused damage to the plaintiff." Id. Plaintiff adequately demonstrates this element in alleging that Community Capital, by advising and assisting the Director Defendants with the stock issuance, helped create the circumstances constituting a breach of the Director Defendants' fiduciary duties to Plaintiff. Dkt. No. 49, ¶¶ 82-83, 163-65. Further, Plaintiff contends that as a result of Community Capital and the Director Defendants' actions, PBI "was left as a shell holding company with no real

AO 72A
(Rev. 8/82)

assets and no way to repay its liabilities to [Plaintiff]." Id.
at ¶ 92.

In sum, Plaintiff's Amended Complaint pleads facts
supporting each of the elements of a claim of aiding and
abetting breach of fiduciary duty against Community Capital.
Thus, Plaintiff's pleading of this claim is sufficient to
withstand dismissal, and Community Capital's Motions to Dismiss
this claim (dkt. nos. 16, 56) are **DENIED**.  However, because
Plaintiff fails to show that the facts are sufficient to sustain
an aiding and abetting claim against the Bank, the Bank's Motion
to Dismiss this claim (dkt. no. 21) is **GRANTED.**

### E. Count VI: Conspiracy to Effect a Fraudulent Transfer

Count VI of Plaintiff's Amended Complaint alleges that
Defendants PBI and the Bank conspired to effect a fraudulent
transfer.  Dkt. No. 49, ¶¶ 183–203.

A plaintiff's standing to assert a right to relief "is the
threshold question in every case."  In re Checking Account
Overdraft Litig., 780 F.3d 1031, 1038 (11th Cir. 2015) (quoting
Warth v. Seldin, 422 U.S. 490, 498 (1975)).  To have standing to
assert a claim of fraudulent transfer, the plaintiff must be a
creditor of the defendant.  See O.C.G.A. § 18-2-74; In re
Friedman's, Inc., 372 B.R. 530, 545 (Bankr. S.D. Ga. 2007).  It
follows, then, that only a creditor has standing to bring an
action for conspiracy to effect a fraudulent transfer.

AO 72A
(Rev. 8/82)

The Bank challenges Plaintiff's conspiracy claim on the grounds that Plaintiff lacks standing, because the Trustee's letter authorized Plaintiff to take the "Directed Actions" outlined in Plaintiff's Direction Letter, which include an action for fraudulent transfer but not a conspiracy to effect the same. Dkt. No. 52, p. 4. However, the Bank overlooks that the Direction Letter, in listing the various parties and claims that Plaintiff intended be asserted, expressly states, "[T]he actions described in this paragraph and <u>any actions ancillary thereto</u> being referred to hereinafter collectively as the 'Directed Actions.'" Dkt. No. 49-1, p. 6 (emphasis added). Because the Direction Letter thoroughly details the events and circumstances giving rise to Plaintiff's fraudulent transfer claims, including the actions taken by PBI and the Bank, and lists fraudulent transfer within the paragraph at issue, it is plausible that the Trustee understood, and intended, for the "Directed Actions" to encompass both fraudulent transfer claims as well as any related claims, such as conspiracy to effect a fraudulent transfer. See <u>Savannah Coll. of Art & Design, Inc. v. Sch. of Visual Arts of Savannah Inc.</u>, 464 S.E.2d 895, 896 (Ga. Ct. App. 1995) ("The gist of the [conspiracy] action, if a cause of action exists, is not the conspiracy alleged, but the tort committed against the plaintiff and the resulting damage."). Thus, Plaintiff's factual allegations plausibly

AO 72A
(Rev. 8/82)

support, at this stage, that the Trustee, in authorizing Plaintiff to take the "Directed Actions," approved of Plaintiff bringing conspiracy claims, such that Plaintiff has standing to pursue the same.

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." Dyer v. Honea, 557 S.E.2d 20, 25 (Ga. Ct. App. 2001) (quoting U.S. Anchor Mfg. v. Rule Indus., 443 S.E.2d 833 (Ga. 1994)). Accordingly, a cause of action for conspiracy "lies not in the conspiracy itself, but in the underlying tort committed against the plaintiff and the resulting damage." Id. (quoting Bell v. Sasser, 520 S.E.2d 287 (Ga. Ct. App. 1999)).

Thus, the conspiracy itself "may sometimes be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances." Cook v. Robinson, 116 S.E.2d 742, 745 (Ga. 1960). In order to show that a conspiracy existed,

> it is not necessary to prove an express compact or agreement to the parties thereto. The essential element of the charge is the common design; but it need not appear that the parties met together either formally or informally, or entered into any explicit or formal agreement; nor is it essential that it should appear that either by words or by writings they formulated their unlawful objects. It is sufficient that two or more persons in any manner either positively or tacitly come to a mutual understanding that they will accomplish the unlawful design.

Id. (citing 1 Eddy on Combinations § 365 (1901)).

As discussed in Subpart II.A, Plaintiff's Amended Complaint sufficiently alleges the occurrence of the underlying tort—PBI and the Bank's fraudulent transfer resulting in injury to Plaintiff.  In addition, Plaintiff alleges numerous facts in support of the existence of a conspiracy between PBI and the Bank: (1) PBI's insolvency and the Bank's financial struggles, dkt. no. 49, ¶¶ 57, 71-73; (2) the parent-subsidiary relationship between the two, id. at ¶ 3; (3) their sharing of the same three board members, id. at ¶ 5; (4) the secret nature of the stock issuance, id. at ¶ 85; and (5) the sale of the stock to PBI's stockholders' friends and families, id. at ¶ 84. The circumstances suggest that PBI and the Bank came to a mutual understanding and shared a common design to leave Plaintiff without the ability to recover on its investment, creating an inference that PBI and the Bank conspired to effect a fraudulent transfer.

Accordingly, PBI's and the Bank's Motions to Dismiss the conspiracy claims in Count VI (dkt. nos. 51-52) are **DENIED**.

## III. Oral Argument

Plaintiff moves for oral argument on the Defendants' Motions, citing the complexity of the issues presented therein. Dkt. No. 36.  However, as demonstrated above, the Court is able to resolve these Motions based on the parties' adequate—and,

indeed, thorough—briefing of these issues. Thus, Plaintiff's
Request for Oral Argument (dkt. no. 36) is **DENIED as moot.**

## CONCLUSION

Based on the foregoing, the Defendants' Motions to Dismiss
on the basis of lack of subject-matter jurisdiction (dkt. nos.
20, 24, 52, 56) are **GRANTED in part** and **DENIED in part:** These
Motions are **GRANTED** in that Plaintiff's claims against all
Defendants seeking to have the Court undo the Bank's stock
issuance or require the Bank to assume repayment obligations on
the TruPS are hereby **DISMISSED** for lack of subject-matter
jurisdiction. These Motions are **DENIED** in that the Court
retains jurisdiction over Plaintiff's damages claims against all
Defendants. To the extent that certain of these Motions also
seek dismissal on the basis of failure to state a claim (dkt.
nos. 24, 52, 56), these portions of the Motions are **DENIED.**

In addition, the Bank's Motion to Dismiss for failure to
state a claim (dkt. no. 21) is **GRANTED in part** and **DENIED in
part** as follows: The Motion is **GRANTED** with respect to
Plaintiff's claim of aiding and abetting breach of fiduciary
duty against the Bank in Count IV, and this claim is hereby
**DISMISSED.** However, the Motion is **DENIED** insofar as it relates
to Plaintiff's fraudulent transfer claim against the Bank in
Count I.

AO 72A
(Rev. 8/82)

The remaining Motions to Dismiss on the basis of failure to state a claim (dkt. nos. 16, 50-51) are **DENIED** in their entireties.  Plaintiff's Request for Oral Argument (dkt. no. 36) also is **DENIED** at this time.

The Clerk of Court is hereby **DIRECTED** to enter an appropriate judgment of dismissal as to Plaintiff's claims for equitable relief as described herein, as well as Plaintiff's claim of aiding and abetting breach of fiduciary duty asserted against the Bank in Count IV of the Amended Complaint.

**SO ORDERED**, this 30TH day of September, 2015.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA